IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

    v.                                                                 **No.: CR 18-2945-WJ**

**JANY LEVEILLE,**
**SIRAJ IBN WAHHAJ,**
**HUJRAH WAHHAJ,**
**SUBHANAH WAHHAJ, and**
**LUCAS MORTON,**

        **Defendant.**

## MOTION TO SUPPRESS INVOLUNTARY STATEMENTS

Pursuant to the Fifth Amendment to the United States Constitution and Rule 12(b) of the Federal Rules of Criminal Procedure, Defendant Hujrah Wahhaj, joined by defendants Siraj Wahhaj, Lucas Morton, Jany Leveille and Subhanah Wahhaj, respectfully moves the Court to suppress pre-trial and anticipated trial testimony of the defendants' children, who were interviewed by the FBI without any legal guardian or parent present. Defendants request an evidentiary hearing to demonstrate that the children's statements, audio recordings of their interviews, and anticipated testimony are and were coerced and were not made voluntarily.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 13, 2019, a grand jury returned the Superseding Indictment (the "Indictment" herein) in this case. *See* Superseding Indictment [Doc. 85]. All defendants are charged with conspiring to plan a terrorist attack (although no evidence has been provided pinpointing the target of this alleged attack) and all defendants, excluding Siraj Wahhaj,[1] are charged with kidnapping Siraj Wahhaj's minor child, AG, resulting in his death. The government further alleges that all defendants were aware that Jany Leveille was an undocumented immigrant and provided her with ammunition in support of their alleged terrorism plan knowing Ms. Leveille was in the country illegally. The Indictment alleges that the defendants "knowingly provided and attempted to provide material support and resources, including currency, training, weapons, and personnel, knowing and intending that they were to be used in preparation for and in carrying out attacks to kill officers and employees of the United States." [*Id.*]

In August 2018, in order to gather information in support of that Indictment, the federal government interviewed the defendants' minor children, without any parental or adult guardian present, in order to gain information concerning their investigation. Rather than adhering to the standard procedures for interviewing children,[2] the federal agents coached the children through their interviews, frequently indicating that if they agreed with the agents' versions of events, they would not be in trouble. The children were told how to answer the questions and led to believe that only by repeating the government narrative, would they be saved from their dire situations. A

---

[1] Siraj Wahhaj is charged with every offense excluding count 7, as he cannot be charged with kidnapping his biological child pursuant to federal law.

[2] Dr. George Davis will be present and will testify concerning the routine and standardized procedures used when interviewing children, as well as the coercive tactics utilized by the FBI during these interviews. Dr. Davis' CV is attached hereto as Exhibit A.

chart has been provided to assist the Court in identifying the children and the timing of the interviews at issue in this motion:

| Name | Age (at time of interview) | Parents | Date(s) of Interview(s) |
|---|---|---|---|
| F. J. | 15 | Jany Leveille and Siraj Wahhaj | 8/07/2018; 8/09/2018; 8/21/2018 |
| J.J. | 13 | Jany Leveille and Siraj Wahhaj | 8/07/2018 or 8/08/2018;[3] 8/09/2018; 8/21/2018 |
| N.A. | 8 | Hujrah Wahhaj | 8/22/2018 |
| A.M. | 8 | Subhannah Wahhaj and Lucas Morton | 8/22/2018 |
| N.W. | 8 | Jany Leveille and Siraj Wahhaj | 8/22/2018 |

Below is a sample of the content from some of the interviews highlighting their coercive nature. At the evidentiary hearing the defendants will, of course, more completely outline all of the content and circumstances that demonstrate that the children's statements were coerced and involuntarily provided.

**Interview of Minor Child F.J. Age: 15, on August 7, 2018**

Fifteen-year-old F.J. was interviewed by the FBI while in foster care, only a few days after being forcibly removed from his family. Neither his parents nor any adult guardian was present with F.J. during this interview.

**Hartman:** Now, you've seen FBI movies, right? So you….

**F.J.:** Yes, if this is a (ui) something like that?

**Hartman:** A 100. We're a 100. So, we…we can tell ok when you're talking to us, you do things that you don't even know that you're doing. And we can tell if you're lying.

**F.J.:** yeah, I let…I let…I let...

---

[3] During an interview on August 9, 2018, FBI Agent Travis Taylor refers to a prior meeting with J.J. It is unclear if that meeting took place on August 7 or August 8 and whether it was in person or telephonic. The government has not yet disclosed a recording of this interview.

**Hartman:** Ok, so, we don't, you know, we don't want you to lie because that….

**F.J.:** Has consequences, when you lie to a Special Agent.

**Hartman:** You're a good kid. Like we can tell. I can tell, you're a fun kid. So, we need you to just be truthful. You're not in trouble, alright. You're not in trouble. Are you in handcuffs?

**F.J.:** No.

**Hartman:** Has anybody said, you're arrested?

**F.J.:** No

**Hartman:** You're not in trouble. So, I'm on Captain America's team.

**F.J.:** And you clearly like Captain America.

**Hartman:** You're on Captain America's team too right?

**F.J.:** Yeah.

See **Exhibit A**, at Bates 3472-73.

The Agents made it clear that there was only one "team" and that was "their" team. F.J. wasn't in handcuffs and wasn't being arrested because he was on the "right" team—he needed to re-iterate the government's version of events. Failure to do so would lead to other, more nefarious consequences. While the agents were sure to put on the record that F.J. was not in handcuffs,[4] he was in an interview room with two federal agents, no adult supervision, no access to a car or means to escape his circumstances, and he was certainly not free to get up and leave the small room in which he was being questioned.

Early in the interview, a visibly nervous F.J. laughed when the agents accused him of telling his foster parents something, an accusation which the agents later determined was a

---

[4] At this point, F.J. was in a small room, sitting across a desk from two FBI agents. The wall next to the chair in which F.J. was seated had a bar to which handcuffs could be secured. Although F.J. was not handcuffed and no handcuffs appear to have been present, the bar added to the intimidating nature of the interrogation room.

misunderstanding by the foster parents. Making clear to F.J. that they did not believe him, the agents chastised him for laughing and suggested he would be in trouble unless he told them what they expected to hear:

> **F.J.**: Yeah, I never told nothing.
>
> **Taylor**: You sure?
>
> **Hartman**: Cause I don't think they're gonna lie to us either because they have no[] reason to. They want what's best for you. They want what's best for everybody, ok? We want what's best for you.
>
> **Taylor**: Is there a reason you risk, you would be afraid to tell us the truth? There's no reason?
>
> **F.J.**: No
>
> **Taylor**: There's no reason?
>
> **F.J.**: (LAUGHS)
>
> **Taylor**: Are you sure? Cause…
>
> **Hartman**: It's….it's not funny. Alright, it's not funny alright. You're not in trouble. Whatever you tell us…..it's gonna stay right here, alright? We're just talking to you, law enforcement to you, ok. Serious business. And so we want to be serious. **We don't want you to be in trouble, ok? So, let's talk about it. Can you tell us?**
>
> **F.J.**: Yeah.
>
> **Hartman**: Yeah?
>
> **F.J.**: (UI) and (UI) I didn't say nothing. (UI)
>
> **Hartman**: Like, we didn't say anything.
>
> **F.J.**: Like, you said asking about training and stuff li[k]e that.
>
> **Taylor**: We've been told that it has come up. And then you recalled twelve month's worth of memories that you gave….when Karen asked you about what happened in the last….ah with that conversation over the weekend. What conversations you had over the weekend, you didn't particular[l]y said you don't remember. Which is pretty astonishing considering that you could name probably could name the weapon that I had on my hip. You named every weapon that was at that residence that you living at. You named what

|  |  |
|---|---|
|  | happened with events when your uncle picked you up. I know you're a smart kid. So, I know you know what conversations you had this weekend **and again we don't want you to be in trouble**. We want you to be helping us, you know, helping America and so if there's anything that you discussed with your foster parents that you think we would want to know, this is the time to tell us. |
| **Hartman**: | You know, you know what we're talking about. You know exactly what we're talking about. You know. It's ok, man because, you just let it out. You know exactly what we're talking about. **Keeping it in isn't gonna do anybody any good**. It's ok man. We're not here to bust you up. You're not in trouble. You're not in trouble at all. It's ok. I….I can see it's there. It's right there. You won't say it. |

See **Exhibit A**, at Bates 3474-75.

The Agents later asked F.J. if he was trained to carry out a terror attack and F.J. answered that their training was for self-defense. Not satisfied with this answer, the agents began applying pressure and insinuating the desired answer:

| **Taylor:** | So, it was training for defense and it was training for attack. And you're saying you never trained, and again, you're not in trouble, someone was, you know leading this training. You never trained for an attack to attack? |
|---|---|
| **F.J.:** | No. |
| **Taylor:** | It's all right, you can tell us. |
| **Hartman:** | And you're not…you're 15 right? You're not making these decisions and we know that. |
| **Taylor:** | You're not an adult until you're 18. |
| **Hartman:** | You're still not in trouble but there's more there, we can tell. It might be something pretty bad but you're not going to get in trouble for telling us. |

See **Exhibit B**, at Bates 3486. F.J's answer wasn't "right." There must be "more", and it must be "pretty bad." The answer he provided was not sufficient to support their investigation and therefore F.J. was instructed to provide a better answer, one that was "bad."

**Interview of Minor Child J. J., Age: 13, on August 9, 2018**

**Taylor:** So, one of things that I talked about before is, I'm a federal agent. I mean you talked to Karen and she's not a federal agent but I'm a federal agent. And lying to a federal agent, you know has consequences. You're not in trouble. I don't want you to be in trouble and I…. you're a good kid, I can tell. Here and talking, you know back was it Tuesday, did…. It would be awesome if we could hang out. You know, I think you're a good kid, I think you did the right thing. But, I know the truth on many of these things and I'm gonna ask you and you telling the truth isn't gonna cause you know, you to be in any trouble. But, it's important that you do tell the truth. And I know Abdul Wahhaj was in New Mexico in Amalia and he was playing with you all and he was part of the family. And I know what happened to him. So that's no reason to tell me that was the last time you saw him was in Georgia. I've talked to his parents. I've talked [Subhanah, Hujrah, and Jany].

See **Exhibit C**, at Bates 2971.

In this section we have a federal agent telling a 13-year-old boy, ripped from his family, living with foster parents, and clearly intimidated by the show of authority, that he is not telling the truth. The agent knows the "truth" and the child must repeat the agent's "truth" in order to be a "good kid."

## ARGUMENT

### *Defendants are Entitled to Suppression of the Statements Made by their Children*

While the Fifth Amendment right against compelled incrimination is a personal right and may not be asserted on another's behalf, numerous federal courts have held that the use of another person's coerced statements and testimony may violate a defendant's rights under the Due Process Clause of the Fifth Amendment. *See Clanton v. Cooper*, 129 F.3d 1147, 1157-58 (10th Cir. 1997), *overruled on other grounds, Becker v. Kroll*, 494 F.3d 904 (10th Cir. 2007). *See also Wilcox v. Ford*, 813 F.2d 1140, 1148 (11th Cir. 1987) ("admission at trial of improperly obtained statements…violates a defendant's Fifth Amendment right to a fair trial."); *United States v. Chiavola*, 744 F.2d 1271, 1273-74 (7th Cir. 1984); *United States v. Fredericks*, 586 F.2d 470, 480 (5th Cir. 1978); *LaFrance v. Bohlinger*, 499 F.2d 29, 34-35 (1st Cir. 1974); *Bradford v. Johnson*, 476 F.2d 66 (6th Cir. 1973), *aff'g* 354 F. Supp. 1331 (E.D. Mich 1972). As stated by the Tenth

Circuit in *Clanton*, when "evidence is unreliable and its use offends the Constitution, a person may challenge the government's use against him or her of a coerced confession given by another person." 129 F.3d at 1157-58; *see also Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994) ("Confessions wrung out of their makers may be less reliable than voluntary confessions, so that using one person's coerced confession at another's trial violates his rights under the due process clause.")

The agents in this case implicitly promised that the children would not be in trouble if they told the government what the government wanted to hear and suggested that they could be in trouble if they did not provide the government the answers that they expected. If the children did not play along, they were going against "Team America" and were not "honest." The promise of leniency was laced with a threat…. tell us what we want to hear, and you won't be in trouble. What would happen if the children didn't regurgitate the government's theory of the case? To children who had recently and forcibly been taken away from their family, the threat coming from self-identified FBI agents was dangerous and explicit.

"Under Supreme Court and Tenth Circuit precedent, a promise of leniency is relevant to determining whether a confession [or as in this case, a statement] was involuntary and, depending on the totality of the circumstances, may render a confession coerced." *Clanton*, 129 F.3d at 1159. Threats to harm or charge a witness's loved one unless the witness cooperates or waives a constitutional right can also be sufficiently coercive to overcome the witness's will and render the cooperation or waiver involuntary. *See United States v. Pacheco*, 819 F. Supp. 2d 1239, 1247 (D. Utah 2011) ("Besides promises of leniency, threats also can undermine the voluntariness of a confession. This is particularly so when the threat is against a defendant's family."); *cf. United States v. Bolin*, 514 F.2d 554, 560-61(7th Cir. 1975) ("In view of the fact that the defendant signed

the consent form while undergoing custodial interrogation and only after he had been impliedly threatened that his girlfriend would be arrested if he did not sign, we hold that the consent was involuntary and therefore invalid."). District Courts within the Tenth Circuit have suppressed recordings that the government claimed were made voluntarily when the totality of the circumstances show that the "consent" provided by the individual recording the call was not freely provided. *United States v. Moore*, 96 F. Supp. 2d 1154, 1160 (D. Colo. 2000) (holding that the federal wiretap law, 18 U.S.C. § 2511(2)(c), was violated because the consent to record the call was not voluntarily given to law enforcement officials).

### *Legal Standards Regarding Coercion*

"A confession runs afoul of the Fifth Amendment when it is obtained by 'government acts, threats, or promises that permit the defendant's will to be overborne'" *United States v. McNeal*, 862 F.3d 1057, 1062 (10th Cir. 2017) (quoting *Griffin v. Strong*, 983 F.2d 1540, 1543 (10th Cir.1993); *see United States v. Williams*, 576 F.3d 1149, 1162 (10th Cir. 2009) ("[A] confession is only involuntary when the police use coercive activity to undermine the suspect's ability to exercise his free will."). When a defendant's will is overborne by coercive police activity, the resulting confession is inadmissible. "A confession cannot be used [as evidence] if it is involuntary." *United States v. Macklin*, 900 F.2d 948, 951 (6th Cir. 1990) (citing *United States v. Washington*, 431 U.S. 181, 186-87 (1977)).

A confession is involuntary when there is (1) coercion or overreaching by law enforcement that (2) overbore the will of the suspect and (3) caused the confession. *See Colorado v. Connelly*, 479 U.S. 165-66 (1986). "[A] finding of coercion need not depend upon actual violence by a government agent"; a credible threat is sufficient and may be mental or physical. *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991). The determination that a statement is involuntary is a

question of law. *United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999). In determining whether a statement was coerced, the court must consider the totality of the circumstances. *Id*. (citing *Fulminante*, 499 U.S. at 285–86). "The relevant circumstances embrace 'both the characteristics of the accused and the details of the interrogation.'" *Id*. (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Lucero v. Kerby*, 133 F.3d 1299, 1311 (10th Cir. 1998). Relevant factors identified by the courts "include the suspect's age, intelligence, and education, the length of detention and questioning, the use or threat of physical punishment, whether *Miranda* warnings were given, the accused's physical and mental characteristics, the location of the interrogation, and the conduct of the police officers." *Gonzales*, 164 F.3d at 1289; *Lucero*, 133 F.3d at 1311.

Coercion can also be present when agents engage in overreaching by exploiting weaknesses or conditions they know to exist. *United States v. Duran*, 2017 WL 3052524, at *1 (D.N.M. June 20, 2017). "The essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne." *Id.* at *2, quoting *United States v. Rith*, 164 F. 3d 1323, 1333 (10th Cir. 1999). In *United States v. Guerro*, the court explained that coercion can exist when the police exploit a known weakness and that a "diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." 983 F.2d 1001, 1004 (10th App. 1993), quoting *United States v. Chrismon*, 965 F. 2d 1465, 1469 (7th Cir. 1992).

### *Assessing Voluntariness*

F.J. and the other children were interviewed by the FBI in a closed setting, without an adult, and were certainly not free to simply get up and leave the meeting. There can be no doubt that this was a custodial interrogation of children, deprived of their parents and any form of a legal guardian.

At no point in any of the interrogations were the children provided with *Miranda* warnings, told they were not required to speak with the FBI, provided access to a lawyer, or even given an adult guardian to sit with them during the interview process. *See* Transcript of Proceedings for detention hearing held on September 12, 2018, 67:3-74:5, attached as **Exhibit D**.

In determining whether or not a statement is voluntary, courts utilize a totality of the circumstances test. "Relevant factors include the suspect's age, intelligence, and education, the length of the detention and questioning, the accused's physical and mental characteristics, and the conduct of the police officers. *United States v. Gonzales*, 164 F. 3d 1285 (10th Cir. 1999).

F.J. and J.J. were interviewed multiple times and often for long periods of time. At no time was an adult, other than the federal agents, present for the interviews. In most instances, a child was interviewed by two federal agents in the room, so the child was always outnumbered by law enforcement. It was inappropriate for the agents to separate the children from their parents to conduct interrogations. At the very least, the presence of some caretaker of the children was necessary to provide the children with an ally they could trust in such a situation. Those agents undoubtedly understood the level of intimidation that such a setting would create and they hoped such a setting would induce the children to provide incriminating information about their families.

Age is also an important factor which requires careful scrutiny. In *J.D.B. v. North Carolina*, the U.S. Supreme Court "found that children are undeniably different from adults and will often feel compelled to speak where an adult would not." 564 U.S. 261 (2011). The court explained the rationale behind its finding:

> Time and again, this Court has drawn these commonsense conclusions for itself. We have observed that children "generally are less mature and responsible than adults," *Eddings*, 455 U.S., at 115–116, 102 S.Ct. 869; that they "often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them," *Bellotti v. Baird*, 443 U.S. 622, 635, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality opinion); that they "are more vulnerable or

> susceptible to ... outside pressures" than adults, *Roper*, 543 U.S., at 569, 125 S.Ct. 1183; and so on. *See Graham v. Florida*, 560 U.S. 48, 68, 130 S.Ct. 2011, 2026, 176 L.Ed.2d 825 (2010)(finding no reason to "reconsider" these observations about the common "nature of juveniles"). Addressing the specific context of police interrogation, we have observed that events that "would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." *Haley v. Ohio*, 332 U.S. 596, 599, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (plurality opinion); *see also Gallegos v. Colorado*, 370 U.S. 49, 54, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) ("[N]o matter how sophisticated," a juvenile subject of police interrogation "cannot be compared" to an adult subject). Describing no one child in particular, these observations restate what "any parent knows"—indeed, what any person knows—about children generally. *Roper*, 543 U.S., at 569, 125 S.Ct. 1183.5

*JDB v. North Carolina*, 564 U.S. at 272 (internal citation and quotations omitted).

Statements provided by children deserve heightened scrutiny and their interviews must be conducted thoughtfully. Instructively, the State of New Mexico has recognized the necessity of precautions to assure statements are given voluntarily. In *State v. Javier M.*, 33 P. 3d 1 (N.M. 2001), the court addressed whether or not children were entitled to *Miranda* warnings when being questioned during an investigatory detention, rather than a custodial interrogation. In *Javier M.*, the child was questioned at a party with many other children present. While holding that the child was not entitled to *Miranda* warnings pursuant to the constitution during an investigatory detention, the Court nevertheless ruled that the New Mexico Legislature "intended to provide greater protection to juveniles than is afforded to adults in the area of police questioning." The court ruled Javier M.'s statements should have been suppressed and reversed his adjudication. *Javier* at ¶ 48.

In this case, the government exploited the defendants' children to obtain testimonial statements to support the charges alleged in the Indictment. The children were isolated, interrogated, and coached throughout the "interviews" to give statements that supported – and only supported – the government's version of events.

## CONCLUSION

The tone, nature and length of the agents' interviews of the children were coercive and their introduction at trial violates the defendants' rights to due process of law under the Fifth Amendment. is the defendants are entitled to an evidentiary hearing at which they may demonstrate to the Court the manner, and extent to which, the children were coerced by the FBI. Based on this pervasive coercion, all statements they made must be suppressed. Specifically, any statements that would have been otherwise admissible at trial, the Court must exclude pursuant to this motion, regardless of the form in which they are intended to be presented. Moreover, the children should not be permitted to testify at the upcoming trial at all, as such testimony is tainted by law enforcement's prior coercive conduct. For the foregoing reasons, the defendants respectfully asks the Court to suppress the statements of the listed children in this matter.

## CERTIFICATE OF CONFERENCE

Undersigned counsel contacted counsel for the United States and the other defendants for their position on this motion to suppress. Counsel for the government, AUSA George Kraehe, advised the government opposes the relief requested herein. Defendants Siraj Wahhaj, Lucas Morton, Jany Leveille and Subhana Wahhaj, through their counsel, join this motion.

- 14 -

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading was served as sealed to opposing counsel via the CM/ECF system on this 28th day of October 2022.

/s/ *Marshall J. Ray*
Marshall J. Ray