IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.	Case No. 1:18-cr-02945-WJ

JANY LEVEILLE,
SIRAJ IBN WAHHAJ,
HUJRAH WAHHAJ,
SUBHANAH WAHHAJ, and
LUCAS MORTON,

    Defendants.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT**

    THIS MATTER comes before the Court upon Defendants Jany Leveille, Siraj ibn Wahhaj, Hujrah Wahhaj, Subhanah Wahhaj, and Lucas Morton's Joint Motion to Dismiss Indictment for Outrageous Government Conduct and Violation of Defendants' Fifth and Fourteenth Amendment Rights of Due Process ("Motion") (Doc. 476). Defendants argue that the government knew that John Doe was in serious danger for months but did not intervene because they hoped to gather evidence of the defendants engaging in terrorist activity. This failure to act on the information they knew, Defendants argue, meant that they could have prevented John Doe's death but chose not to, which constitutes outrageous conduct for which the indictment should be dismissed. The United States responds that the government did not participate in any wrongdoing, and even if it did, the government did not create the crime or coerce Defendants into committing it. Doc. 502 at 11, 15. Having reviewed the parties' submissions and the applicable law, the Court finds that Defendants' Motion is not well-taken and therefore DENIES it.

## BACKGROUND

Defendants[1] are alleged to have kidnapped a three-year-old child, John Doe—the son of defendant Siraj ibn Wahhaj—from the child's mother and brought him to a remote compound in Amalia, New Mexico. Doc. 1 ¶ 17. It is alleged that Defendants, John Doe, and several other children lived at the compound for a period of months, during which Defendants performed repeated, demanding prayer rituals on John Doe. *Id.* ¶¶ 17, 19. According to a report from one of the other children present on the compound and a diary entry from one of the defendants, John Doe died during one of these prayer rituals. *Id.* ¶ 19. This alleged conduct led to kidnapping charges against Defendants Jany Leveille, Hujrah Wahhaj, Subhanah Wahhaj, and Lucas Morton. Doc. 85 at 8–9. During their time at the compound, all the Defendants allegedly obtained firearms and conspired to kill officers and employees of the United States, which led to additional terrorism and firearms-related charges. *See generally* Doc. 85.

The parties agree that the alleged kidnapping was reported in early December 2017. Doc. 476 at 2; Doc. 502 at 4. John Doe's mother, Hakima Ramzi, contacted the police and filed a missing person report. Doc. 476 at 2; Doc. 502 at 4. This report included the information that Siraj ibn Wahhaj had taken John Doe to a park in late November and had not returned. Doc. 476 at 2; Doc. 502 at 4. On January 9, 2018, when John Doe still had not returned home, the Clayton County Juvenile Court issued an arrest warrant and pick up order for Siraj ibn Wahhaj and John Doe, which included the information that John Doe had severe medical issues requiring constant attention. Doc. 476 at 6; Doc. 502 at 6–7. Defendants contend that law enforcement authorities knew where John Doe was located as of early January 2018, Doc. 476 at 5, 7, that the Taos County

---

[1] Defendant Siraj ibn Wahhaj is John Doe's father and therefore is not charged with kidnapping. *See* Doc. 85 ¶ 35.

Sheriff's Office ("TCSO") had sent officers to observe the Amalia compound in May 2018, *id.* at 7, and that a neighbor reported to a TCSO detective that he had seen John Doe on the Amalia compound in May 2018, *id.* at 7–8. Nonetheless, the parties agree that it was not until early August 2018 that authorities executed a search warrant on the Amalia property and found John Doe's body. Doc. 476 at 10; Doc. 502 at 10.

## LEGAL STANDARD

To be legally sufficient, an indictment must "(1) contain[] the essential elements of the offense intended to be charged, (2) sufficiently apprise[] the accused of what he must be prepared to defend against, and (3) enable[] the accused to plead a judgment under the indictment as a bar to any subsequent prosecution for the same offense." *United States v. Kilpatrick*, 821 F.2d 1456, 1461 (10th Cir. 1987) (citing *Russell v. United States*, 369 U.S. 749, 763–64 (1962)). However, additional constitutional requirements exist: if law enforcement conduct is "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," the Court cannot allow the case to be prosecuted. *United States v. Harris*, 997 F.2d 812, 815 (10th Cir. 1993) (quoting *United States v. Russell*, 411 U.S. 423, 431–32 (1973)).

An outrageous government conduct defense is a narrow one, applicable only when "considering the totality of the circumstances in any given case, the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice." *United States v. Johnson*, 130 F.3d 1420, 1429 (10th Cir. 1997) (internal quotation marks and citation omitted). In most cases where this rare defense has been upheld, the two factors of "government creation of the crime and substantial coercion" tend to "form the underpinnings" of the cases. *United States v. Mosley*, 965 F.2d 906, 911 (10th Cir. 1992). It is distinct from an entrapment defense, which inquires into the defendant's predisposition to commit the crime; "the outrageous governmental

conduct defense looks only at the government's conduct." *United States v. Sneed*, 34 F.3d 1570, 1576–77 (10th Cir. 1994).

## ANALYSIS

Defendants argue that law enforcement engaged in outrageous conduct in two ways: by delaying the search for John Doe in an effort to obtain evidence for unsubstantiated terrorism claims, and by interviewing Defendants' minor children after Defendants' arrest and without parental consent. In the event that these actions do not constitute outrageous government conduct, Defendants ask the Court to use its inherent supervisory power to dismiss the indictment. The Court addresses these arguments in the order Defendants have presented them.

### I. Outrageous Conduct by Delaying Search for John Doe

Defendants first argue that law enforcement engaged in outrageous conduct by delaying their search for John Doe, even after they knew his location and the risks he faced from his medical conditions, in the hopes that they could gather evidence of Defendants engaging in terrorist activity before they executed the search warrant on the Amalia compound. Doc. 476 at 14. They argue that by prioritizing efforts to investigate Defendants for terrorism, they left John Doe to die when they could have intervened before his death. *Id*. The United States responds that the outrageous government conduct defense is inapplicable here because it does not cover the government's post-offense conduct or the quality of its investigation while the criminal conduct is ongoing. Doc. 502 at 14–15.

Case law for this defense tends to focus on either "excessive governmental involvement in generating a new crime solely to prosecute it" or the government's decision to "induc[e] a defendant to become involved in the crime for the first time, rather than merely interposing itself in an ongoing criminal enterprise." *Sneed*, 34 F.3d at 1577. If a defendant is already involved in

criminal activity, the government's actions to "induce him to expand or extend previous criminal activity" do not constitute excessive governmental involvement. *Id.* (quoting *Mosley*, 965 F.2d at 911). In effect, expanding or extending previous criminal activity is exactly what Defendants claim that law enforcement has done here: Defendants argue that law enforcement allowed their alleged criminal enterprise to go on longer than it needed to, and longer than it was safe for the child in question.

Indeed, the circumstances here differ from the types of cases Defendants cite. In *Rochin v. California*, 342 U.S. 165, 166 (1952), police officers entered the defendant's home, saw him take two pill capsules, and jumped on him and attempted to extract the capsules from his mouth. When this intrusion did not retrieve the capsules, they handcuffed the defendant and brought him to the hospital to have his stomach pumped against his will, which revealed that he had swallowed morphine in violation of California law. *Id.* The Supreme Court held that such a physically violent intrusion into the defendant's body shocked the conscience and violated the Due Process Clause. *Id.* at 173. This case did not apply the outrageous government conduct defense, which originated in *United States v. Russell*, 411 U.S. 423 (1973), but its logic is similar. *See Mosley*, 965 F.2d at 909 ("The outrageous conduct defense was first articulated in *United States v. Russell* . . . ."). However, there is a marked difference between police officers affirmatively intruding into a person's body to search for evidence of a crime by means of nonconsensual stomach pumping and what Defendants allege happened in the present case, which is a failure to act to protect a child in need. Particularly given the fact that *Rochin* is not formally a part of outrageous government conduct jurisprudence, the Court declines to extend its holding on affirmative intrusion into a suspect's body to law enforcement *inaction*, however serious.

In other cases, courts have rejected the outrageous government conduct defense even when the government was more closely involved in the case than it was here. *See Mosley*, 965 F.2d at 913–14 (rejecting defense when government displayed excessive zeal in offering only cocaine to a defendant seeking to purchase marijuana and may have purposefully sold it at a low price and in a distributable quantity); *Sneed*, 34 F.3d at 1577–78 (FBI establishing a "front" organization that allowed defendant to perpetrate securities fraud was not creation of a crime because defendant "readily adapted and refined the suggested plan" and took a "direct, active, and primary role in organizing and planning" the fraud, and FBI was not coercive in promising $147,000 in compensation because defendant negotiated for that number, so it was not a unilateral offer); *Harris*, 997 F.2d at 817–19 (compensating cocaine addict with a cut of cocaine sale was not outrageous government conduct, but engaging in multiple transactions may be, depending on police purpose in continuing transactions and extent of police knowledge of defendant's addiction); *Johnson*, 130 F.3d at 1429–30 (informant gave third-party acquaintance a rock of cocaine from controlled purchase with defendant before meeting with law enforcement, but this was not outrageous government conduct because government acknowledged that it was informant's "only way out" of the situation without rousing suspicion and because this exchange had nothing to do with defendant). In contrast to these many cases, in which the government was actively engaging in criminal "sting" operations, law enforcement in the present case did not set up the kidnapping, suggest it to Defendants, provide the means by which the kidnapping might continue, or otherwise intertwine itself in the wrongdoing that took place. Defendants' allegations are of deliberate *inaction*, and this does not satisfy either the creation or coercion prongs of the outrageous government conduct defense. Contrary to Defendants' assertions, identifying Defendants' completed conduct as a crime is not the same as "generating a new crime solely to

6

prosecute it," Doc. 525 at 8—Defendants were the ones allegedly who initiated their course of action and took all necessary criminal steps, not law enforcement.

*If* Defendants' allegations are true that law enforcement had the ability to rescue three-year-old John Doe before he died and instead chose to let him perish in an effort to obtain evidence for otherwise-unfounded terrorism charges against Defendants based on religious profiling, that choice is worthy of unflinching condemnation. However, the Court need not determine whether that characterization of events is accurate to determine whether the outrageous government conduct defense applies. Even if the government made the cruel and calculating choice Defendants ascribe to it, that conduct would not be enough to satisfy the outrageous government conduct defense and dismiss the charges against Defendants. No government actor induced Defendants to kidnap John Doe; no government actor suggested it, or encouraged it, or arranged for it to be done. If the government did choose not to intervene to prevent John Doe's death even when it had all the information necessary to do so, that choice deserves judgment—but it does not in any way mean that the government created the circumstances or coerced Defendants into their alleged choices to kidnap John Doe in such a way that caused him to die. These facts do not satisfy the outrageous government conduct defense.

**II.     Outrageous Conduct by Interviewing Children Without Parental Consent**

Defendants also argue that law enforcement violated due process by seizing Defendants' minor children and interviewing them without parental consent, which constitutes outrageous conduct because Defendants' parental rights were still intact. Doc. 476 at 23; Doc. 525 at 8–9. The United States responds that this, too, fails to meet either of the factors for the outrageous government conduct defense because this activity took place after the alleged crime had been

committed, so it could not have served to create the offense or coerce Defendants into performing it. Doc. 502 at 19–20.

Defendants cite no examples of cases that engage with the outrageous government conduct defense based on government conduct *after* the alleged crime.[2] Defendants currently have a pending motion to suppress the statements made by their children, Doc. 482, and the Court will take that motion under consideration once it has been fully briefed to determine whether the children's statements were taken unlawfully. A motion to suppress is an appropriate method by which concerns about unauthorized searches or interrogations by law enforcement should be considered. *See, e.g., United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1229 (10th Cir. 1998) (arguing suppression when a minor child gave police consent to search parent's motel room). In contrast, an outrageous government conduct defense generally deals with government conduct during a sting operation. *Sneed*, 34 F.3d at 1576 (citing *Mosley*, 965 F.2d at 908). Defendants have failed to demonstrate that the children's statements made to law enforcement after their parents were arrested can justify an outrageous government conduct defense. Defendants do not address the issue of post-offense conduct in their reply brief even after the United States raised the concern in its response brief, and the Court finds the United States' argument persuasive on this issue.

### III.   Inherent Supervisory Power of the Court

---

[2] To the extent Defendants rely upon the Seventh Circuit case *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003) for the proposition that interviewing children about the possibility of child abuse without parental consent under non-emergency circumstances is a due process violation, the case is inapposite. *See* Doc. 476 at 23–24. *Doe* does not refer to the outrageous government conduct defense; it deals specifically with the due process question. *See* Doe, 327 F.3d at 522–23. Even if the interview with Defendants' children did violate Defendants' constitutional rights—a question the Court will not touch until briefing on the motion to suppress is finished—*Doe* does not discuss the possibility of whether such an interview would be "so shocking, outrageous and intolerable that it offends the universal sense of justice." *United States v. Johnson*, 130 F.3d 1420, 1429 (10th Cir. 1997). The Court will not read outrageousness as a synonym for a due process violation.

Finally, Defendants argue that even if the outrageous government conduct defense does not apply on its own terms, the Court should use its inherent supervisory power to dismiss the Superseding Indictment based on the outrageousness of the government conduct in this case. Doc. 476 at 25. The United States responds that not only have Defendants failed to demonstrate Fifth or Fourteenth Amendment violations based on outrageous conduct, but they have also provided no evidence of the government's conduct impairing the Court's independence or of the government's conduct being illegal. Doc. 502 at 21.

The Court holds supervisory power to dismiss an indictment or reverse a conviction for three purposes: "to implement a remedy for violation of recognized rights," "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury," and "as a remedy designed to deter illegal conduct." *United States v. Hasting*, 461 U.S. 499, 505 (1983) (citations omitted). Courts should not employ such an option if "means more narrowly tailored to deter" the problematic conduct exist. *Id.*

As addressed above, Defendants have not brought forth a sufficient argument for a violation of recognized rights. As for the second factor, the issue here is an indictment, not a conviction, and there is no evidence that the indictment puts forth any inappropriate considerations. Therefore, the question for the Court is whether the indictment should be dismissed to deter law enforcement's purported illegal conduct. The Court finds that in this case, dismissal of the Superseding Indictment pursuant to the Court's inherent supervisory power would not be a proper use of such inherent supervisory power.

Defendants have made only threadbare allegations of religious discrimination, and it is not clear from their briefing or attached documents why the delay in searching for John Doe at the Taos property took place. The TCSO supplemental report by Detective Armijo indicates that he

9

had found Defendant Lucas Morton's property in Taos as early as January 2, 2018, and that he notified Detective Porter of the Clayton County Police Department of this finding. Doc. 476-15 at 2. Months later, in June 2018, Detective Armijo received information that the FBI was monitoring the Amalia compound in Taos and had sent photos of the children there to John Doe's mother who did not identify John Doe in any of the photos. *Id.* at 2–3. In August 2018, the TCSO received information from the Clayton County Police Department indicating that indicated that the residents of the compound could be facing starvation. *Id.* at 3. Shortly afterward, the TCSO executed a search warrant on the property. *Id.*

This timeline does not suggest that law enforcement waited intentionally to accrue additional evidence against Defendants. Rather, the FBI monitored the property and sent photographs to John Doe's mother, and John Doe's mother did not find John Doe among the children photographed. It is possible, though the question remains for trial, that by January 2, 2018, when law enforcement identified that Defendants could be in Taos County, John Doe had already passed away. *See* Doc. 467-2 at 4 (TCSO sheriff's email stating that evidence from a journal would put John Doe's death on December 24, 2017). Even if John Doe was still alive, it is possible that law enforcement chose not to enter the property because they did not have photographic evidence of John Doe's presence and were waiting for surveillance to reveal something more definitive to avoid prematurely initiating a potentially dangerous search. It is also possible that law enforcement delayed for improper reasons; however, the information currently before the Court is far from conclusive and so the Court will not dismiss the Superseding Indictment to deter conduct that may not have even happened.

Defendants also emphasize that law enforcement searched Siraj ibn Wahhaj's property in Alabama on May 1, 2018, under the authority of the arrest warrant for Siraj ibn Wahhaj and pick-

up order for John Doe. Doc. 476 at 17–18. This choice suggests that law enforcement believed the warrant and pick-up order were sufficient to allow a search of property even if they did not have evidence that John Doe was present there. Yet, they did not choose to exercise the same power to enter the Amalia compound in New Mexico. Defendants argue that this series of choices is evidence of law enforcement's improper focus on imagined terrorism charges rather than the known risk to John Doe's life. *Id.* The Court does not pretend to know what law enforcement's rationale was for choosing to search one property in May but not the other until August when evidence of possible starvation arose. However, there is insufficient evidence at this time to establish that the choice was made in violation of the constitution or other law—indeed, the explanation of the delay is all Defendants' conjecture. Simply stated, Defendants' claims lack sufficient support for the Court to employ such a drastic measure as dismissing the Superseding Indictment.

For the above stated reasons, Defendants' Motion (Doc. 476) is DENIED.

**IT IS SO ORDERED.**

_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE