IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | CRIMINAL NO. 18-CR-02945 WJ |
| vs. ) | |
| ) | |
| JANY LEVEILLE, ) | |
| SIRAJ IBN WAHHAJ, ) | |
| HUJRAH WAHHAJ, ) | |
| SUBHANAH WAHHAJ, and ) | |
| LUCAS MORTON, ) | |
| ) | |
| Defendants. ) | |

**UNITED STATES' RESPONSE TO DEFENDANTS' MOTION
TO SUPPRESS INVOLUNTARY STATEMENTS**

The United States respectfully submits this response in opposition to Defendants' Motion to Suppress Involuntary Statements (Doc. 482). In their motion, the Defendants claim that federal agents coerced some of their children to make statements after the Defendants were arrested, and they ask the Court to hold an evidentiary hearing and suppress the children's pre-trial statements as well as the children's anticipated trial testimony. Doc. 482 at 1. For the reasons set forth below, the United States disputes the Defendants' contentions, opposes the motion, and respectfully requests that the motion be denied without an evidentiary hearing.

**I.     FACTUAL BACKGROUND**

On Friday, August 3, 2018, the Taos County Sheriff's Office (TCSO) executed a search warrant at the compound where the Defendants and their children had been residing since the end of 2017. *See* First Search Warrant, attached hereto as Exhibit 1. The warrant was executed to check on the welfare of the residents, including the many small children known to be living there, and it was based on probable cause to believe that Siraj Ibn Wahhaj (Siraj) and/or John Doe, Siraj's

missing three-year-old son who had been taken from his mother in Georgia, were present at the compound. *Id.*; *see also* Doc. 566.

On August 3, 2018, officers executing the warrant encountered all five Defendants as well as 11 of the Defendants' children, but the whereabouts of John Doe remained a mystery.[1]  *See* Exhibit 1; *see also* Second Search Warrant, attached hereto as Exhibit 2.  Each of the Defendants was asked about John Doe, but none provided any information about his whereabouts; none told law enforcement that John Doe had died at the compound and that his body was hidden in a tunnel. *See* Exhibit 2.

The officers collected several weapons, dozens of rounds of ammunition, and other items, and Siraj and Morton were arrested.  *Id.*; *see also* Search Warrant Return, attached hereto as Exhibit 3 (photographs omitted), and State Charges Filed Against Siraj and Morton, attached hereto as Exhibit 4.  Siraj, who refused to identify himself, was arrested pursuant to an arrest warrant from the State of Georgia after Hakima Ramzi, John Doe's mother, positively identified Siraj, and Morton was arrested and charged with harboring a fugitive.  *See* Exhibits 2 and 4. Defendants Leveille, Hujrah Wahhaj, and Subhanah Wahhaj were not arrested at that time.  *See* Exhibit 2.

The situation was obviously dangerous, and officers described the living conditions at the compound as deplorable, filthy, and disgusting.  *Id*.  There was no running water, electricity, or

---

[1] As described in the United States' Response in Opposition to Defendants' Motion to Suppress Evidence Derived as a Result of Search Warrant for Unit 2, Lot 28 in Costilla Meadows, Taos County, NM (Doc. 566), officers first encountered Defendant Lucas Morton (Morton) above ground and outside the compound near a white box truck, and Morton told the agents that they should not be there and that they were "all going to get hurt, big time, I promise you." Doc. 566 at 14.  Siraj and at least one of the older male children armed themselves and were ready to defend the compound.  *Id*.  It was later learned that, before any shots were fired, Defendant Jany Leveille (Leveille) instructed them and the others to surrender.  *Id*.

food at the compound, and officers found a leaking propane gas tank. *Id*. Moreover, the Defendants and their children had poor hygiene and were believed to have not eaten in days. *Id*.

Because of the unsafe and substandard living conditions at the compound, the New Mexico Children, Youth, and Families Department (CYFD) took the Defendants' 11 children, who ranged in age from one to 15 years old, into protective custody. *Id*. Safe house interviews of some of the children were conducted by CYFD, and the children were asked about the still-missing John Doe, whose prolonged disappearance was understandably concerning. A couple of the children disclosed that John Doe had lived and perished at the compound. *Id*.

Given this information, the TCSO sought and obtained another search warrant to return to the compound and look for John Doe's body. *Id*. This warrant was signed by a state district court judge on Sunday, August 5, 2018, and officers began executing the warrant on Monday, August 6, 2018. *See* Exhibits 2 and 3. John Doe's decomposing remains were found in a tunnel when the second search warrant was executed, and all five Defendants were arrested and criminally charged by the State of New Mexico with multiple counts of child abuse. *See* Exhibit 3 at 35 and 39; *see also* State Charges filed August 6, 2018, and August 8, 2018, attached hereto as Exhibits 5 and 6. In addition to John Doe's body, during this search officers found and seized multiple firearms and additional rounds of ammunitions, as well as a notebook that was open in plain sight containing a multiple-page, handwritten entry entitled "Phases of a Terrorist Attack." *See* Doc. 566-14.

After John Doe's body, the weapons, and the terrorist attack planning notebook were found, several of the children were interviewed by Federal Bureau of Investigation (FBI) agents and a child forensic interviewer. The initial interviews were conducted at the FBI office in Santa Fe, New Mexico, on August 7, 2018, with the permission of CYFD personnel; follow-up interviews were done in August 2018 at a CYFD office in Taos, New Mexico. Every interview

was conducted with the consent of the children's legal guardians, whether the consenting guardians were CYFD itself or the foster parents. Moreover, the guardians and foster parents, who transported the children for the interviews, sometimes provided the agents with additional information they learned from conversations with the children so the agents could be better informed of the children's knowledge and statements when interviewing the children.

An FBI child forensic interviewer first interviewed F.L.J. and J.L.J. [2] on August 7, 2018, and agents watched the child forensic interviews before interviewing the children themselves. F.L.J., who was 15 years old at the time, was interviewed by agents on August 7, 9, and 21, 2018. J.L.J., who was 13 years old at the time, was interviewed by agents on August 9, 10, and 21, 2018. N.A., A.M., and N.W., who were each eight years old at the time, were only interviewed on August 22, 2018. In sum, agents interviewed two of the oldest children three separate times and the three eight-year-old children once.[3]

When F.L.J. and J.L.J. were first interviewed by the forensic child examiner on August 7, 2018, they were not truthful about John Doe being at the compound. F.L.J. did not disclose that John Doe had died at the compound, and when asked if there was anything his parents were worried about other people learning, he responded, "I don't know, I don't think so" and that he could not

---

[2] The Defendants, in their Motion to Suppress Involuntary Statements, claim that Leveille and Siraj are the parents of F.L.J. and J.L.J. (Doc. 482 at 3), but this is not true because F.L.J. and J.L.J. are not Siraj's children. Their father, who resides in New York, had not known his children's whereabouts and was elated to finally be reunited with his children when CYFD returned the children to him.

[3] The reports, transcripts, and recordings of all the children's interviews with the FBI will be provided to the Court under separate cover. The Defendants, who already received these materials, will also receive an identical binder that will be provided to the court-appointed discovery coordinating attorney. It is evident within the first few minutes of each recording that the children were not coerced when they made their statements. Moreover, many of these reports specifically state that the interviews were conducted at the CYFD office, and the reports sometimes specifically mention that the interviews were conducted with the consent of a foster parent.

remember because it had been so long. *See* Video Recording of F.L.J.'s Child Forensic Interview, provided under separate cover (Binder Tab 1).[4] J.L.J. told the child forensic examiner that he last saw John Doe in Georgia and that John Doe had stayed with his mother in Georgia rather than going to New Mexico with them. *See* Video Recording of J.L.J.'s Child Forensic Interview, provided under separate cover (Binder Tab 3).[5]

The agents knew the children had not been honest with the child forensic examiner, and they knew that F.L.J. had told his foster parents the same story that J.L.J. told the child forensic examiner—that John Doe was last seen in Georgia. *See* Doc. 482-2 at 12; *see also* August 7, 2018, Transcript of F.L.J. Interview at Bates Number (BN) 3491 (Binder Tab 2). Other children had already disclosed that John Doe died at the compound, and unbeknownst to the children, officers had found John Doe's body.

The agents were well aware that the children were not being honest. The agents gently pressed F.L.J. to tell the truth when they started their interview with him, and they accurately advised him there are consequences for not being truthful. *See, e.g.*, August 7, 2018, Transcript of F.L.J. Interview at BN 3470 (Binder Tab 2). Thereafter, F.L.J. was the first to mention John Doe, and then one agent asked him, "Ok, what's going on with [John Doe]?" *Id*. at BN 3475. F.L.J. initially stated, "I don't know. I heard that he was missing." *Id*. F.L.J. also acknowledged that he had told his foster mom he last saw John Doe in Georgia, and he nodded his head when an

---

[4] This portion of the conversation occurs at approximately 28 minutes and 20 seconds into the recording identified as VTS_01_2.VOB.

[5] This portion of the conversation begins at approximately 23 minutes into the recording identified as VTA_01_2.VOB.

agent asked if he last saw John Doe in Georgia. *Id*.; *see also* August 7, 2018, Video Recording of F.L.J.'s Interview with Agents (Binder Tab 2).[6]

Knowing that F.L.J. was lying, the agents directly told him so and how they knew he was lying. *Id*. F.L.J. then began telling the truth—that John Doe had been in New Mexico, and that F.L.J. had held, fed, and cared for him. *See* Binder Tab 2 at BN 3475-76. F.L.J. said John Doe's heart stopped, and he began to cry. *Id*. at 3476. He then continued to tell the agents about the religious rituals Leveille instructed Siraj to perform on John Doe. *See* Binder Tab 2. He described John Doe's death, what happened to John Doe's body afterwards, and other happenings at the compound. *Id*.

The tone of all of the children's interviews was gentle and non-threatening, and the agents ensured that the children understood the importance of being honest. The agents advised the children of the consequences of lying, particularly the eldest children who initially provided false statements. Indeed, it is customary to admonish all witnesses to tell the truth, and it would have been reckless for the agents to have not advised the children of the importance of telling the truth, particularly when the agents knew the children were not being candid and given the gravity of the situation.

Throughout the interviews, the agents did not rush the children, but instead repeatedly told the children they were not in trouble, that it was understandably difficult to discuss the matters they were discussing, and that the children were good kids. The agents never once threatened the children or made them any promises, and they appropriately gave reassurance when the children understandably needed some comfort as they described horrific events.

---

[6] This portion of the conversation starts at approximately 16 minutes on the recording identified as VTS_01_1.VOB.

Moreover, the agents asked open questions, allowing the children to use their own words to describe what they witnessed, lived, and endured, and the agents ensured that the children understood their questions. The agents in no way had a pre-determined story they wanted the children to corroborate, but rather were surprised to learn about what had occurred at the compound over a period of approximately eight months. Prior to executing the search warrants, law enforcement officers, including the FBI, did not know that John Doe had passed away and that the eldest children were receiving tactical training to be prepared to engage in jihad, to die as martyrs, and to engage in volent acts, as alleged in the indictment. *See* Doc. 566.

## II.     ARGUMENT

It is important to first make clear that, although the Defendants allege their children "were interviewed by the FBI without any legal guardian or parent present," Doc. 482 at 1 and 10, this is not true. The children had been in CYFD's custody for approximately four days before any of the FBI interviews, and each interview was conducted with the full consent of CYFD and/or the children's foster parents.[7] Each child's legal guardian(s) were also present for each and every interview, having brought the children to the interview themselves. It is troubling that Defendants would deliberately misstate this fact.

The FBI had permission of the legal guardians to interview the children, but, regardless, there is not a shred of evidence indicating the interviews of the children were coercive. This is evidenced by the fact that the Defendants, in an effort to support their motion to suppress the children's statements, selectively attach only part of the transcript of F.L.J.'s August 7, 2018

---

[7] It is worth noting that several months after the Defendants were arrested and their children were placed in CYFD custody, all five Defendants voluntarily relinquished their parental rights to all 11 children rescued at the compound. Upon information and belief, the Defendants no longer have any legal rights to their children, who are being raised by other family members.

7

interview, and the transcript of J.L.J.'s August 9, 2018 interview. *See* Docs. 481-1, 482-2 and 482-3.[8]  Despite selecting only these particular transcripts and highlighting specific dialogue within these them, Defendants have not pointed toward any evidence that supports their position.

Contrary to what the Defendants assert, the reports, transcripts, and recordings make clear that the children were not coerced to speak with the agents or to make any statements in support of a prosecution against their parents, aunts, and uncles.  The evidence instead demonstrates that the agents properly interviewed the children, a necessary and proper step as part of the investigation of this case.  Accordingly, the Defendants' motion to preclude the children from having an opportunity to tell the jury what they experienced and observed during the approximate eight months they lived at the compound should be denied.

I. **The Children's Prior Statements to Law Enforcement Are Inadmissible Hearsay, and the United States Has Never Intended to Introduce the Children's Prior Into Evidence at Trial.**

Defendants seek the suppression of all statements made by the five children who were interviewed by the FBI in August 2018, but they incorrectly assume that the United States would seek to introduce into evidence statements that are clearly inadmissible hearsay.  To the extent that the Defendants argue the United States should not introduce the reports, transcripts, and recordings of the children's interviews, the motion should be denied as moot because the United States agrees that it will not seek the admission of these out of court statements as substantive evidence.[9]

---

[8] Docs. 482-1 and 482-2, Bates numbers 3466-3492, are transcripts of F.L.J.'s August 7, 2018, interview.  The Defendants did not include the last page of the interview transcript.  *See* Bates Numbers 3466-3495 (Tab 2).

[9] The children's statements from August 2018 are inadmissible hearsay but may be used, if necessary, to refresh the children's recollections or to impeach them if their testimony at trial contradicts their prior statements.

Article VIII of the Federal Rules of Evidence addresses hearsay and the exceptions to the hearsay rule. Rule 801 defines hearsay as:

> [A] statement that:
> (1) the declarant does not make while testifying at the current trial or hearing; and
> (2) a party offers in evidence to prove the truth of the matter asserted in the statement.

F.R.E. 801(c). It is undisputed that the children's prior statements, made approximately five years before this case is expected to go to trial, clearly satisfy the definition of hearsay and hence would be inadmissible if offered for the truth of the matter asserted therein.

The United States recognizes that the dictates of Rule 801 protect against the introduction of statements by a witness who cannot be cross-examined and serve the sound public policy of allowing the jury to assess the credibility of the witness. As should be expected, the United States does not intend to seek to introduce the hearsay reports, transcripts, or recordings of the children's prior interviews into evidence, but instead intends to call the children to testify before the jury. The Defendants' motion should be denied.

**II. The Children's Statements to Law Enforcement Were Not Coerced, and Hence Defendants Failed to Meet Their Burden of Presenting Sufficient Evidence of a Serious Factual Dispute that the Children's Statements Were Coerced.**

**A. Defendants bear the burden to present sufficient facts of coercion to warrant an evidentiary hearing.**

A criminal defendant does not have standing to suppress a coerced statement from a witness as a violation of the witness's constitutional rights. *See United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999) ("Obviously, defendants cannot seek to vindicate any violations of the subject witness' Fifth Amendment rights."). This is because, generally, constitutional rights are individual rights that can only be vindicated by the individual whose rights have been violated. *See Clanton v. Cooper*, 129 F.3d 1147, 1157 (10th Cir. 1997) (stating that "only the victims of the

unconstitutional conduct may challenge the unconstitutional nature of the officer's actions, because only their rights have been violated.").

A defendant does, however, have standing to challenge the voluntariness of witness statements[10] the government intends to use against the defendant as a violation of the defendant's right to a fair trial under the Due Process Clause of the Fifth Amendment. *See United States v. Dowell*, 430 F.3d 1100, 1107 (10th Cir. 2005) (stating that in challenging the voluntariness of a witness confession the defendant "is not seeking to vindicate the witness's Fifth Amendment right against self-incrimination, but instead is seeking to protect his own right to due process").

Nevertheless, there is a significant difference in the burden the defendant bears when trying to suppress a third party's statements as opposed to his own. *Id.* When a defendant moves to suppress his own statements, which he claims were coerced, the government bears the burden "…to demonstrate the voluntariness of a defendant's admissions or confessions…." *Id.* (quoting *People v. Badgett*, 895 P.2d 877, 886 (Cal. 1995)). By contrast, when a defendant seeks to suppress statements made by a witness on due process grounds, "the burden of proving improper coercion is on the defendant." *Id.*

The mere assertion that a witness's statements were coerced is insufficient to require the Court to hold an evidentiary hearing to determine if the statements or testimony should be suppressed. Instead, to be entitled to an evidentiary suppression hearing, a defendant must present

---

[10] For the purposes of determining whether a coerced statement is admissible against a defendant, there is no difference between a confession and a statement. *See Griffin v. Strong*, 983 F.2d 1540, 1542 (10th Cir. 1993) ("It is well established that the Fifth Amendment protects against the admission of incriminating statements of all kinds, whether considered to be confessions or not. No distinction can be drawn between statements which are direct confessions and statements which amount to 'admissions' of part or all of an offense.") (internal quotations omitted).

sufficient evidence that shows a serious factual dispute suggesting the witness's statements were coerced. *Id.* (citing *La France v. Bohlinger*, 499 F.2d 29, 36 (1st Cir. 1974)). As explained herein, even if the children's interviews were to be offered as evidence, which they are not, the Defendants cannot meet this burden because the children's statements were not coerced.

### B. The determination of whether a statement of a witness was coerced is based on the totality of the circumstances.

The standard for determining if a statement was voluntarily made or coerced is the same whether the court is considering a statement made by the defendant or a statement made by a third party. *See Dowell*, 430 F.3d at 1107 (citing *United States v. Gonzales*, 164 F.3d 1285, 1289 n.1 (10th Cir. 1999)). The central question in determining whether a statement has been coerced is whether the witness's will was overborne. *Id.* (quoting *United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999)) ("A statement is involuntary if the government's conduct caused the witness' will to be overborne and his capacity for self-determination critically impaired."); *see also United States v. Young*, 964 F.3d 938, 943 (10th Cir. 2020) (quoting *United States v. Perdue*, 8 F.3d 1455, 1466 (10th Cir. 1993) (stating that the central question to determining if a statement is voluntary is whether the statement "is the product of an essentially free and unconstrained choice by its maker.").

To determine if a witness's will was overborne, the Court must look at the totality of the circumstances. *Young*, 964 F.3d at 943. In doing so, the court must consider "both the characteristics of the accused [or the witness] and the details of the interrogation." *Id.* (quoting *United States v. Toles*, 297 F.3d 959, 966 (10th Cir. 2002)). The specific relevant factors the court must consider when assessing whether a criminal defendant's confession was coerced "include the witness's age, intelligence, and education, the length of detention and questioning, the use or threat of physical punishment, whether *Miranda* warnings were given, the accused's physical and mental

11

characteristics, the location of the interrogation, and the conduct of the police officers." *Dowell*, 430 F.3d at 1107.  No specific factor is dispositive, and the totality of circumstances test does not favor any single factor over the others. *Young*, 964 F.3d at 943 (quoting *Sharp v. Rohling*, 793 F.3d 1216, 1233 (10th Cir. 2015)).

Nevertheless, "coercive police activity is a necessary predicate to the finding that a confession is not voluntary." *Id.* (quoting *Colorado v. Connelly*, 479 U.S. 157 (1986)).  Therefore, the court should consider the conduct of the law enforcement officers before considering a witness's personal characteristics.  This is because "personal characteristics of the [witness] are constitutionally irrelevant absent proof of coercion."  *See United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998) (quoting *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir. 1987). In other words, the witness's age, mental capacity, and personal idiosyncrasies "are only relevant if the court first concludes that the officers' conduct was coercive." *Id.*

### C. The conduct of the FBI agents who conducted the interviews of the children was not coercive.

The Defendants only explicitly allege that the FBI agent's conduct was coercive in two ways.  First, the Defendants allege that the FBI agents used implicit promises of leniency to coerce the children into to making statements incriminating the Defendants.  *See* Doc. 482 at 8.  Second, the Defendants claim the FBI agents threatened the children by implying they would be in trouble if they did not "play along" with some preconceived false narrative about the Defendants.  *Id*. Neither of these allegations are true, and the interview recordings make clear that the agents encouraged the children to tell the truth and repeatedly advised them they were not in trouble.  The agents did not threaten the children, nor did they make them any promises, other than to assure them they were not in trouble (because they were not).

Although promises of leniency are relevant to determining whether a confession was involuntary or coerced, *see Young*, 964 F.3d at 943 (citing *Clanton v. Cooper*, 129 F.3d 1147, 1159 (10th Cir. 1997), "vague promises" which provide little more than "limited assurance" are not coercive. *See United States v. Lopez*, 437 F.3d 1059, 1065 (10th Cir. 2006); *see also Cooper*, 129 F.3d at 1159 (stating that promises of leniency must be "sufficiently compelling and linked to the confession so that it could be said that the defendant's will was overcome by the offer" to be coercive); *see also United States v. Garot*, 801 F.2d 1241, 1245 (10th Cir. 1986) (stating that to determine if a promise of leniency was coercive the court should ask "whether the accused was so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action.").

Courts have also found statements that arguably may sound threatening to not be coercive. In *United States v. Rodebaugh*, the Tenth Circuit held that the statement, "if you work with us, we'll go easy on you," did not amount to coercion. 798 F.3d 1281, 1293 (10th Cir. 2015). The Court reasoned that the phrase was both "vague and non-committal" and could not be understood to have so enticed the defendant to have overborne his will. *Id.* Instead, the Court concluded that the statement was nothing more than a "limited assurance" that is a "permissible interrogation technique." *Id.* This is in line with other Tenth Circuit opinions that have held general encouragement does not constitute coercion. *See United States v. Lewis*, 24 F.3d 79, 82 (10th Cir. 1994) (holding that an officer's promise to make the defendant's cooperation known to the United States Attorney's Office was a limited assurance that did not coerce the defendant's following statements); *see also United States v. Roman-Zarate*, 115 F.3d 778, 783 (10th Cir. 1997) (holding that the agent's representations of leniency to the defendant did not transform his later statements into involuntary utterances).

Like the officer's promise in *Rodebaugh,* the agents' statements during the interviews of the children do not amount to coercion. First, unlike the defendants in the aforementioned cases, the children in this case were not charged with and were not at risk of being charged with any crimes.[11] The agents made this fact abundantly clear to the children by explaining to them repeatedly that they were not in trouble and that telling the truth would not cause them to be in trouble. This is a crucial distinction because, since the children were not being charged or investigated themselves, there was no "leniency" the agents could offer the children in exchange for their cooperation. Instead, the agents' statements were merely attempts to assure the children they were in an environment in which they could and should speak truthfully without consequence.

Second, even if the children's witness statements were viewed as "confessions," which they were not because the children were not suspected of wrongdoing, encouraging the children to cooperate with the investigation by informing them of the importance of being honest and the consequences of lying are nothing more than "vague and non-committal" statements that are permissible and crucial investigatory techniques. The agents' statements to the children were not promises of leniency that rendered their responses involuntary, but rather customary admonishments that are given to witnesses, and that should always be given to witnesses, especially when agents know or have reason to believe the witnesses are not being honest.

In this case, the agents calmly and gently spoke with the children and appropriately reproached them to tell the truth. The agents never once threatened the children, but instead did their best to not be intimidating and to make the children feel comfortable. The children were not

---

[11] The Defendants complain that the agents did not advise the children of their *Miranda* rights, Doc. 482 at 11, but it was wholly unnecessary because the children were not facing any criminal charges and were not in custody.

14

locked up, restrained, or even touched by any of the agents.  Their legal guardians had brought them there and were right outside the interview rooms.

Given the lack of police coercion, the children's personal characteristics are irrelevant, but even their personal characteristics do not support precluding them from testifying about the events they lived.  The children, who were 8, 13, and 15 years old at the time, are intelligent and articulate, as evidenced by their interviews.  They understood what they were being asked and were able to competently answer the questions.  It is an unfortunate fact that children, even very small children, must witness or experience terrible things and must sometimes testify about that.  But the children whose testimony is at issue in this case are certainly capable of telling a jury about what they experienced in 2017 and 2018, especially given that they will have the benefit of an additional five years of maturity by the time this case goes to trial.  The totality of circumstances supports a finding that the agents' conduct toward the children was not coercive when the children were interviewed in August 2018.

The Defendants take the position that the general context of the interviews and the FBI agents' straightforward conduct during the interviews inevitably amounted to implicit coercion simply because the minority age of the children made them more susceptible to having their will overborne, but the evidence does not support their contention.  Doc. 482 at 8, 11.  Based on this threadbare assertion, the Defendants request an evidentiary hearing to show the children's statements were coerced.

The Court should deny both the Defendants' request to suppress the children's hearsay statements and future testimony and the Defendants' request for an evidentiary hearing because the Defendants have failed to show a serious factual dispute suggesting the children's hearsay statements were coerced.  The reports, transcripts, and recordings make clear that the agents did

absolutely nothing during their interviews with the children that could reasonably be interpreted as coercive.

### III.  CONCLUSION

Wherefore, the United States respectfully requests that the Court deny the Defendants' Motion to Suppress Involuntary Statements (Doc. 482) because the United States will not attempt to introduce inadmissible hearsay into evidence, but rather will call the children themselves to testify at trial. The jury is entitled to hear from the children who, having lived at the compound for approximately eight months, are crucial witnesses to explain what occurred there. Even if the children's statements were subject to admission as evidence, the Defendants have failed to meet their burden of showing the children's statements to the FBI in August 2018 were coerced, and the Defendants cannot meet this burden because the agents appropriately admonished the children to tell the truth and allowed the children to tell what they experienced. The motion should be denied without an evidentiary hearing.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically Signed*
KIMBERLY A. BRAWLEY and
TAVO HALL
Assistant United States Attorneys
P.O. Box 607
Albuquerque, NM 87102
(505) 346-7274

CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2023, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon defense counsel. A hard copy will be mailed to Defendant Lucas Morton at his address of record.

    *Electronically Signed*
Kimberly A. Brawley
Assistant United States Attorney