IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                   Case No. 1:18-cr-02945-WJ

JANY LEVEILLE,
SIRAJ IBN WAHHAJ,
HUJRAH WAHHAJ,
SUBHANAH WAHHAJ, and
LUCAS MORTON,

    Defendants.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS COUNT FIVE**

THIS MATTER comes before the Court upon Defendants Subhanah Wahhaj, Hujrah Wahhaj, Jany Leveille, Siraj ibn Wahhaj, and Lucas Morton's Motion to Dismiss Count Five ("Motion") (Doc. 555). Defendants seek dismissal of Count Five of the Superseding Indictment, which charges Jany Leveille with unlawfully possessing firearms as an undocumented immigrant, and the other defendants with aiding and abetting her in this endeavor, in violation of 18 U.S.C. §§ 922(g)(5) and 2. Their argument is that pursuant to *New York State Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111 (2022), 18 U.S.C. § 922(g)(5) is an unconstitutional limitation on undocumented immigrants' Second Amendment rights. Doc. 555 at 1. The United States responds that under the test outlined in *Bruen*, Section 922(g)(5) remains a constitutional limitation on firearm access. Doc. 579 at 3. Having reviewed the parties' submissions and the applicable law, the Court finds that Defendants' motion is not well-taken and therefore DENIES it.

## BACKGROUND

The allegations in this case are lengthy, and the Court reproduces here only what is necessary to address the motion at issue. Allegedly, Defendants[1] kidnapped a three-year-old child, John Doe—the son of one of the defendants—and brought him to a remote compound in Amalia, New Mexico. Doc. 1 ¶ 17. It was the kidnapping that initiated a law enforcement investigation, but when law enforcement eventually searched the compound, they found numerous firearms. The Superseding Indictment alleges that various defendants brought firearms across state lines, provided firearms to the other defendants, shot those firearms on the compound, and otherwise trained with the firearms as part of a terrorist conspiracy. Doc. 85 at 2–4. Because defendant Jany Leveille is not a United States citizen and is not lawfully present in the United States, her alleged possession and use of these firearms and the other defendants' alleged provision of the firearms to her violates federal law. *Id.* at 7–8.

## LEGAL STANDARD

18 U.S.C. § 922(g)(5) forbids aliens who are "illegally or unlawfully in the United States" from "ship[ping] or transport[ing] in interstate or foreign commerce, or possess[ing] in or affecting commerce, any firearm or ammunition; or [receiving] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." However, limitations on firearm access must be considered in light of the Second Amendment to the United States Constitution, which reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

---

[1] Defendant Siraj ibn Wahhaj is John Doe's father and therefore is not charged with kidnapping. *See* Doc. 85 ¶ 35.

Of course, the Second Amendment's language does not allow unfettered access to firearms to anyone who wants one. The United States Supreme Court of has made clear that "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" are still permissible notwithstanding the Second Amendment's declaration that the right to bear arms "shall not be infringed." *District of Columbia v. Heller*, 554 U.S. 570, 626–27, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).

To determine which limitations on access to firearms are acceptable, the Supreme Court has set forth a test. In *Bruen*, the Supreme Court considered a set of New York laws which prohibited carrying a handgun without a license and granted licenses only when an applicant could demonstrate "proper cause"—that is, "a special need for self-protection distinguishable from that of the general community." 142 S. Ct. at 2117. To determine whether such a law violates the Second Amendment, the Court first looked to whether the plain text of the Second Amendment protects the conduct at issue—including, for example whether the individuals seeking to bear arms are members of "the people," and whether their relevant weapons are "in common use" for self-defense. *Id.* at 2119. After a determination that the plain text of the Second Amendment did cover the applicants' conduct, the burden fell to the licensing office in New York to show that the law is "consistent with this Nation's historical tradition of firearm regulation." *Id.* The Court found that the New York laws were not consistent with a historical tradition, and therefore, that the licensing office had not carried its burden. *Id.* at 2121. As a result, the Court struck down the New York laws as unduly infringing on the applicants' Second Amendment rights. *Id.*

**DISCUSSION**

Defendants argue that at the first step of the *Bruen* analysis, Section 922(g)(5) violates the plain text of the Second Amendment and therefore places a burden on the United States at the second step to justify the restriction as consistent with this nation's historical traditions of firearm regulation. This Court will now analyze each prong of the *Bruen* test.

**I.   Plain Text**

The Second Amendment grants to "the people" the right to bear arms. Defendants argue that in 1791, when the Second Amendment was enacted, "the people" would have included aliens unlawfully present in the United States. Doc. 555 at 13. Other constitutional protections include noncitizens, even non-citizens without legal status in the United States: the Fifth Amendment's initial statement that "no person shall be . . .", the Sixth Amendment's coverage of an "accused" even if the accused is a noncitizen, and the Fourteenth Amendment's embrace of "any person" in its Due Process and Equal Protection Clauses. *Id.* at 11 (citing *United States v. Huitron-Guizar*, 678 F.3d 1164, 1167 (10th Cir. 2012)). Because this interpretation would include individuals living in the United States without legal status, Defendants argue that Section 922(g)(5) violates the plain text of the Second Amendment. Doc. 555 at 14. The United States responds that "the people" in the Second Amendment does not include non-citizens and that even if it did, *Bruen* makes clear that its holding applies only to law-abiding individuals, so aliens who are unlawfully present in the United States do not qualify. Doc. 579 at 6.

Before *Bruen*, the Tenth Circuit interpreted "the people" to refer to individuals who are part of the national community, a term broader than "citizens" but narrower than "persons." *Huitron-Guizar*, 678 F.3d at 1167–68 (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 269, 110 S. Ct. 1056, 108 L. Ed. 2d 222 (1990)). The Tenth Circuit "hesitate[d] to infer from

*Heller* a rule that the right to bear arms is categorically inapplicable to non-citizens." *Id.* at 1168. Ultimately, given historical and legal uncertainty in this area, the Tenth Circuit chose to defer to Congress and assume without deciding that "at least some aliens unlawfully here" could have Second Amendment rights. *Id.* at 1169. The Tenth Circuit then went on to analyze the level of scrutiny applicable to laws under the Second Amendment, a practice which is no longer good law after *Bruen*. *See Bruen*, 142 S. Ct. at 2127.

*Bruen* did not directly opine on the question of whether non-citizens, present lawfully or unlawfully, were part of the Second Amendment's conception of "the people." While the opinion did frequently refer to "law-abiding citizens" as the individuals possessing Second Amendment rights, the citizenship question was not before the Supreme Court, rendering this language dicta. *See, e.g., id.* at 2133, 2138, 2150, 2156. Additionally, as the Tenth Circuit recognizes in *Huitron-Guizar*, undocumented immigrants receive the protections of other constitutional provisions, such as the Fifth Amendment, Sixth Amendment, and Equal Protection and Due Process Clauses of the Fourteenth Amendment. 678 F.3d at 1167.

Given the ambiguity in this field, the Court will follow the Tenth Circuit's lead and assume purely for the sake of argument, but clearly without this Court deciding, that the Second Amendment's reference to the right of "the people" to bear arms includes "at least some aliens unlawfully here." *See id.* at 1169 (applying *Heller*). [2] Therefore, the Court moves to the second step of the *Bruen* inquiry.

---

[2] The United States makes an additional argument that Jany Leveille was not "law-abiding" based on her undocumented status and her "leadership in a kidnapping and a jihadist conspiracy." Doc. 579 at 6. The Tenth Circuit's assumption includes at least some unlawfully present aliens, so for the sake of argument, Court will make the same assumption with regard to Ms. Leveille's undocumented status. As for her alleged involvement in the crimes at issue in this case, Defendants argue that Ms. Leveille is presumed innocent until proven guilty. Doc. 651 at 4. The United States

## II. Historical Tradition

*Bruen* next requires the government to bear the burden of demonstrating that firearm restrictions of the type at issue in this case are "consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2135. Defendants argue that past laws prohibiting firearm ownership were discriminatory; withholding firearm rights from undocumented individuals, who may be property owners, pay taxes, and have rights to a public education, would promote the xenophobia of our nation's past over the very real needs of non-citizens for armed self-protection. Doc. 555 at 15–16. Since Defendants' argument goes back to 1791 during the first term of President George Washington when the Second Amendment was enacted, the United States responds that historically during this time period, members of the population who were considered outsiders or possibly disloyal to the new Government of the United States were not given rights to firearms, including Native Americans, Catholics, and individuals who refused to swear an oath of allegiance. Doc. 579 at 10–11. The United States argues that Section 922(g)(5) is historically derivative of this power to exclude. *Id.* at 12. Even if this law is not historically derivative, the United States argues that it is analogous to historical, colonial-era restrictions, another route permissible under *Bruen*. *Id.* The concept of immigration restrictions only took root in the United States in the late nineteenth century, but in the United States' view, restrictions on unauthorized immigrants carrying firearms are analogous to the colonial-era restrictions on perceived outsiders. *Id.* at 13.

The colonial-era laws that the United States mentions tend to focus more on allegiance than on membership in a particular group. For example, the prohibition on Catholics owning firearms

---

does not argue that she had any prior convictions. Therefore, the Court will not rule on this particular argument advanced by the United States.

took place in 1756; Virginia required individuals to swear allegiance to the "Hanoverian dynasty and to the Protestant succession and to swear an oath abjuring the ecclesiastical authority of the Pope," which of course caused problems for Catholics, who saw the Pope as their ecclesiastical authority. Robert H. Churchill, *Gun Regulation, The Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007). Still, if Catholics swore this oath, justices of the peace would return their weapons to them. *Id.* Later, after the American Revolution, Pennsylvania "required all white men over eighteen to swear an oath declaring allegiance to the commonwealth, abjuring all allegiance to the British monarchy, and promising to do nothing injurious to the freedom and independence of the state," ordering anyone who did not swear this oath disarmed. *Id.* at 159.[3]

The Court rejects the notion that Section 922(g)(5) is directly historically derivative of any colonial-era laws. As the United States freely admits, immigration restrictions as they are understood today did not come into being until the late nineteenth century; before that point, immigration was relatively free, open, and unquestioned. "Early American Immigration Policies," United States Citizenship and Immigration Services, 30 July 2020, https://www.uscis.gov/about-us/our-history/overview-of-ins-history/early-american-immigration-policies (last accessed 16 Feb. 2023). Therefore, the Court finds that the more appropriate analysis of any Second Amendment right in this context would take place by analogy because no comprehensive

---

[3] The Court focuses on these historical laws pertaining to oaths of allegiance rather than on the disarmament of Native Americans, which the United States also references in its brief. The Court does not find the prior history of disarmament of Native Americans meaningfully comparable to present-day disarmament of undocumented immigrants. Native Americans were, of course, already present on the North American Continent before any Europeans arrived, and there was an element of direct conflict between colonists and Native Americans that is not present in present-day interactions between the United States Government and undocumented immigrants in the United States illegally.

immigration regulations existed in early American history. *See Bruen*, 142 S. Ct. at 2132 ("[S]o too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy[.]"). Two relevant metrics for comparison are "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 1233.

By analogy, the Court does find that the historical restrictions on individuals who did not swear an oath of allegiance or otherwise might be considered national outsiders is sufficiently similar to Section 922(g)(5) to support the law as it exists today. Today's immigration system functions as an attempt to define the nation's members and nonmembers. Certainly, any number of examples prove that this metric is flawed: controversy abounds over noncitizens brought here without authorization as infants, who have only known a home in this nation, and who nonetheless frequently face difficulties in attaining lawful citizenship despite clear loyalty to the United States. There are many others who would gladly take the opportunity to become Americans if a pathway to legitimate residency or citizenship existed for them. Alternatively, there are natural-born citizens, national "insiders," who feel no loyalty to their nation and wish it as much harm as any foreign terrorist might. But at its base, the current immigration laws are the imperfect system the United States has set up as a proxy for national allegiance. A history of laws restricting firearm ownership for individuals who refuse to swear allegiance to the United States is analogous to laws directed at undocumented immigrants—not perfectly so, because many undocumented immigrants do not so much *refuse* as lack any legitimate opportunity to swear such an oath, but analogous nonetheless. *See Bruen*, 142 S. Ct. at 2133 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical

*twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.").

In terms of the questions of "how" and "why" Section 922(g)(5) burdens individuals' rights to armed self-defense, the answers track closely with historical restrictions on firearm access to individuals who did not swear an oath of allegiance. Indeed, the question of *how* appears the same—a total prohibition of firearm access—and *why* appears quite similar—because, in the view of the legislature, providing firearms to those who have not demonstrated allegiance to this nation might put weapons in the hands of those who would do the nation harm. Again, the circumstances do not track perfectly, but *Bruen* counsels that the analogized laws need not be identical as long as they are "relevantly similar." *Id.* at 2132–33.

Defendants' argument that many undocumented immigrants have a great need for armed self-protection may very well be a valid contention. *See* Doc. 555 at 15 (citing risk of hate crimes). The same argument may very well be true for many convicted felons, who may have dangerous acquaintances or even enemies who wish them harm. On the other hand, by enacting Section 922(g)(5), Congress appears to espouse the view that these needs are secondary to broader public safety concerns about firearm possession within these groups. This Court is not a legislative body: its task today is only to determine whether Section 922(g)(5) violates the Second Amendment, not to weigh the merits and faults of Section 922(g)(5) from a policy perspective.

## CONCLUSION

For the reasons described above, the Court finds that Section 922(g)(5) does not run afoul of the Second Amendment. Accordingly, Defendants' Motion (Doc. 555) is DENIED.

**IT IS SO ORDERED.**

_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE