IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                       Case No. 1:18-cr-02945-WJ

JANY LEVEILLE,
SIRAJ IBN WAHHAJ,
HUJRAH WAHHAJ,
SUBHANAH WAHHAJ, and
LUCAS MORTON,

    Defendants.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS INVOLUNTARY STATEMENTS**

**THIS MATTER** comes before the Court upon Defendants' Motion to Suppress Involuntary Statements (Doc. 482), filed October 28, 2022. Defendants seek to exclude from evidence the statements made by their children during interviews with FBI agents, arguing that the statements were made under coercion. The parties agree that these statements are hearsay, but they disagree about whether such statements might be admissible for other purposes—for example, impeachment or refreshing a witness's recollection—or whether the statements were coerced and including them in any manner would violate Defendants' right to a fair trial. Having reviewed the parties' submissions and the applicable law, the Court finds that the motion is not well-taken and it is therefore **DENIED**.

**BACKGROUND**

Defendants[1] are alleged to have kidnapped a three-year-old child, John Doe—the son of defendant Siraj ibn Wahhaj—from the child's mother and brought him to a remote compound in Amalia, New Mexico. Doc. 1 ¶ 17. It is alleged that Defendants, John Doe, and several other children lived at the compound for a period of months, during which Defendants performed repeated, demanding prayer rituals on John Doe. *Id.* ¶¶ 17, 19. According to a report from one of the other children present on the compound and a diary entry from one of the defendants, John Doe died during one of these prayer rituals. *Id.* ¶ 19. This alleged conduct led to kidnapping charges against Defendants Jany Leveille, Hujrah Wahhaj, Subhanah Wahhaj, and Lucas Morton. Doc. 85 at 8–9. Eventually, law enforcement obtained a warrant for the Amalia property and entered it to search for Mr. Wahhaj, John Doe, and anyone else in need of a wellness check based partly on information suggesting that at least one family member might be starving. Doc. 574-1. Law enforcement entered the Amalia compound and found that the family was living in squalid conditions. Doc. 574-2 at 3. They took the children into state custody. *Id.*

A few days later, a child forensic interviewer conducted interviews with some of the children, including F.L.J. (age fifteen) and J.L.J. (age thirteen). Aug. 7 2018 Forensic Child Interview of F.L.J.: *US v. Jany Leveille et al* 3596; Aug. 7 2018 Forensic Child Interview of J.L.J.: *US v. Jany Leveille et al* 3598. Subsequently, FBI agents interviewed these children again. During this process, when the children stated information the agents knew to be false, the agents reminded the children while neither was in any trouble, the agents knew they had lied, and it was important to be truthful in these interviews. Docs. 482-1 at 5, 482-2 at 6–7, 482-3 at 4. The children eventually told the FBI agents what they had witnessed while they were living on the compound,

---

[1] Defendant Siraj ibn Wahhaj is John Doe's father and therefore is not charged with kidnapping. *See* Doc. 85 ¶ 35.

including statements about the death of John Doe in a forced prayer ritual and the preservation of his corpse in anticipation of his resurrection. Doc. 482-1 at 11–12, 482-3 at 11.

## LEGAL STANDARD

A defendant may seek to suppress his own involuntary statements based on his Fifth Amendment right against self-incrimination. *Mincey v. Ariz.*, 437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). However, when a defendant seeks to exclude the involuntary or coerced statements of *others*, he can only argue that admission of those statements at trial violates his due process right to a fair trial—he cannot argue suppression on behalf of the children's rights. *United States v. Dowell*, 430 F.3d 1100, 1107 (10th Cir. 2005). The defendant bears the burden of proving improper coercion under these circumstances, but the standard for involuntariness remains the same whether a defendant seeks to suppress his own coerced statements or exclude those of others. *Id.*

A statement is involuntary when the government causes an individual's "will to be overborne and 'his capacity for self-determination [to be] critically impaired.'" *United States v. McCullah*, 76 F.3d 1087, 1101 (10th Cir. 1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26, 93 S. Ct. 2041, 2047, 36 L. Ed. 2d 854 (1973)). The factors that a court considers when determining whether a statement was coerced are "the suspect's age, intelligence, and education, the length of detention and questioning, the use or threat of physical punishment, whether *Miranda* warnings were given, the accused's physical and mental characteristics, the location of the interrogation, and the conduct of the police officers." *United States v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999).

## ANALYSIS

The Court first notes that the disagreement between the parties on this matter is quite narrow. The United States freely admits that the direct statements from the children's interviews are hearsay. Doc. 574 at 8. The United States wants to call the children as witnesses at trial, not to rely on the statements from the interviews as evidence in their case-in-chief. *Id.* However, the United States argues that the hearsay statements could be admissible for other purposes, such as to refresh the children's recollection or to impeach them if their testimony differs from what they said in the interviews. *Id.* at 8 n.9. The United States argues the Court should not exclude reference to the children's statements for these limited purposes. Defendants agree that the statements are hearsay, but they go further, arguing that even use of the statements to refresh the children's recollection or impeach them would be impermissible because the statements were coerced and their use in any capacity would violate Defendants' right to a fair trial. Doc. 588 at 6.

The reasons Defendants claim that the interviews were coercive are that 1) the context of the interviews was inherently coercive because the children were minors who had been recently separated from their parents, had no familiar adults present with them at the interviews, were outnumbered by the agents during the interviews, and were not given *Miranda* warnings or told they were free to leave or request a lawyer; and 2) the agents made coercive statements to the children.

I.   **Context of the Interviews**

The Court first addresses the question of context: the children's age, lack of parental presence, recent entry into foster care, lack of *Miranda* warnings, and sensitivity to power dynamics between themselves and the FBI agents interviewing them. As a preliminary matter, the children did not require *Miranda* warnings because they were not facing custodial interrogation. *See United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000) (*Miranda* warnings only

4

required for custodial interrogation, and "custody" requires a degree of curtailed movement comparable to arrest). For this reason, the lack of *Miranda* warnings, and specifically the lack of any affirmative statement to the children that they were free to leave or could seek counsel, was not required here.

 Still, more broadly, the children were minors enduring traumatic circumstances, including the death of a child at the compound where they all were residing, a recent separation from their families and placement into foster care. The children also likely felt somewhat intimidated to be interviewed by FBI agents; however, many adults likewise would feel intimidated during an FBI interview. These difficulties are real and important considerations when examining the possibility of coercion, but the Court also notes that these vulnerabilities are inherent to interviews with children who faced domestic abuse, witnessed their parents committing crimes, or otherwise were taken into state custody following their parents' arrests. As the United States points out, it is a deeply unfortunate fact of society that vulnerable individuals sometimes bear witness to traumatizing events, Doc. 574 at 15, but the mere fact that law enforcement asks those witnesses questions about what they saw does not necessarily establish coercion. As occurred here, children are routinely placed with other caregivers when their parents have been arrested, and some degree of nervousness is not uncommon in a law enforcement interview. While this situation is certainly vulnerable, it is not prohibitively so, and law enforcement has an incentive to interview the children quickly before they forget important details of their experiences.

 More telling to the present analysis is the fact that the agents did not appear to purposefully intimidate the children. Rather, they made a point to repeatedly remind the children that they were not in trouble, that nothing they said would cause them to be in trouble, that the agents believed they were good kids, and that what they were saying was not "crazy" notwithstanding their unusual

circumstances. *See* Doc. 482-1 at 4, 8–12; Doc. 482-2 at 2, 6–7; Doc. 482-3 at 4, 21, 45, 53–54. In response to these reassurances, the children appeared to feel comfortable enough to speak truthfully. For example, the agents asked the children about the possibility of Defendants orchestrating a school shooting, and the children repeatedly insisted that they had never heard anything about that even when the agents persisted in questioning about it. *See* Doc. 482-2 at 8; Doc. 482-3 at 50. The coercion analysis considers the totality of the circumstances, *Dowell*, 430 F.3d at 1107, and here, the Court finds that the full context of the interview allowed the children to express themselves honestly, without coercion from the agents.

## II. Agents' Specific Statements

At times during the interviews, the children made statements that the agents knew to be false based on other information that the agents had already obtained. In response to those statements, the agents admonished the children to tell the truth, specifically informing them that lying to a federal agent has "consequences." Doc. 482-1 at 5, 8; Doc. 482-3 at 4. In the interview with F.L.J., they told him that they knew he was not telling them everything and what was not yet said might be "bad," and asked him if he was "on Captain America's team, too," like the agents were. Doc. 482-1 at 4, 8; Doc. 482-2 at 7.

Most easily addressed are the statements about being on Captain America's team. These statements refer to a popular series of superhero movies from Marvel Studios. The agents' attempts to build trust with a fifteen-year-old boy by referencing a popular movie franchise and attempting to align both themselves and the child with the "good guys" of the movie is not an impermissibly coercive interviewing tactic. Rather, it appears to be an attempt to frame something unfamiliar and potentially frightening—an interview with federal agents—in the context of something that might be more familiar to the child and therefore might put him at ease. Certainly, defense counsel and

other reasonable minds might disagree with the characterization of FBI agents as "Captain America's team" and the "good guys," but the agents' lighthearted attempts to paint themselves in a good light and build camaraderie with a child do not, in the Court's view, constitute coercion.

Similarly, the statements that F.L.J. had not told the agents everything and that what he had not told them might be "bad" were acceptable within the context of the interview. The Court disagrees with Defendants' contention that the agents would only accept a "bad" narrative of what had happened. Rather, F.L.J. had already been crying earlier in the interview, and he was now exhibiting a reluctance to speak about the purpose of the weapons training on the compound. Doc. 482-1 at 11; Doc. 482-2 at 6–7. The agents told him, "You're still not in trouble but there's more there, we can tell. It might be something pretty bad but you're not going to get in trouble for telling us." Doc. 482-2 at 7. Far from insisting that F.L.J. tell them something "bad" before they would accept his narrative of events, the agents were clearly attempting to reassure him that *even if* he told them something bad, he still would not get in trouble.

Finally, the Court looks to the agents' statements that lying to a federal agent has "consequences." Threats, while not necessarily dispositive, are an important consideration in the totality of the circumstances to determine whether an individual's will has been overborne by coercion. *United States v. Rodebaugh*, 798 F.3d 1281, 1292 (10th Cir. 2015). However, in *Rodebaugh*, the Tenth Circuit found that in context, the statement, "If you work with us, we'll go easy on you, otherwise we are going to take your house and all of your property away from you" was either not a threat or not coercive under the circumstances. *Id.* The Tenth Circuit determined that the first half of the phrase, "If you work with us, we'll go easy on you," was "vague and non-committal," a "limited assurance" that would not overcome a person's will and therefore a "permissible interrogation tactic." *Id.* at 1293 (quotations omitted); *cf. United States v. Barraza-*

7

*Rocha*, No. Crim. 16-455, 2016 WL 9460663, at *3, *6 (D.N.M. Aug. 17, 2016) (unduly coercive to suggest that interviewee could have her children taken away unless she cooperated). Similarly, the statement by the agents in the present case that lying to a federal agent has "consequences," without more, is the type of vague admonition that falls short of coercion. Indeed, while the agents did state that lying had consequences, they also stated several times that the children were not in trouble and that what they told the agents would not cause them to be in trouble. *See* Doc. 482-1 at 8–11; Doc. 482-2 at 6–7; Doc. 482-3 at 4, 45, 53–54. As a result, the Court finds that in context, as part of an analysis of the totality of the circumstances, the agents' statements were permissible.

## CONCLUSION

For the above reasons, the Court finds that the children's statements were not the product of coercion, and therefore use of those statements does not violate the Defendants' right to a fair trial. Furthermore, for the same reasons, the Court finds the Defendants did not meet their burden to demonstrate a "serious factual dispute" as to whether the children's statements were coerced so as to be entitled to an evidentiary hearing on the issue. *Dowell*, 430 F.3d at 1108 (holding repeated police phone calls over a four year period and promise of leniency to witness against defendant did not entitle him to an evidentiary hearing on coercion); *see also United States v. Merkt*, 794 F.2d 950, 961-62 (5th Cir. 1986) (evidentiary hearing not warranted when neither "witness claimed that he or she was threatened or coerced into making untrue statements"). This is particularly true in the instant case, where the United States does not intend to introduce the children's statements as direct evidence, but instead asks the Court not to exclude the statements for potential use to impeach or refresh the witnesses' recollections.

The Court reiterates that, as the parties have agreed, the statements are hearsay and are not admissible as direct evidence in the United States' case-in-chief. The Court defers ruling on their

8

admissibility for the purposes of impeachment and refreshing the witnesses' recollections until the issue is presented at trial.

Defendants' Motion to Suppress (Doc. 482) is therefore **DENIED**.

    **IT IS SO ORDERED.**

                                                  _____
                                                  WILLIAM P. JOHNSON
                                                  CHIEF UNITED STATES DISTRICT JUDGE