# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                 Case No. 1:18-cr-2945-WJ

JANY LEVEILLE,
SIRAJ IBN WAHHAJ,
HUJRAH WAHHAJ,
SUBHANAH WAHHAJ, and
LUCAS MORTON,

     Defendants.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO SUPRESS EVIDENCE FOR LACK OF STANDING

**THIS MATTER** is before the Court on Defendants' Joint Motion to Suppress Evidence (Doc. 471). On August 3, 2018, the Taos County Sheriff's Office ("TCSO") executed a search warrant on Unit 2, Lot 28 of the Costilla Meadows Subdivision ("Lot 28") in Taos County, New Mexico. Defendants resided on Lot 28 at the time of the search but did not have lawful title to the property. On March 28, 2023, the Court held an evidentiary hearing to address whether Defendants have standing to assert the search violated their Fourth Amendment rights. The Parties presented evidence at the hearing and then filed written closing arguments along with proposed findings of fact and conclusions of law. Docs. 719, 725. Upon review of the evidence presented, the Parties' arguments, and the applicable law, the Court concludes Defendants lack Fourth Amendment

standing to challenge TCSO's August 3, 2018, search of Lot 28. Defendants' Joint Motion to Suppress Evidence (Doc. 471) is therefore **DENIED**[1].

## BACKGROUND

The United States initiated their case against Defendants by criminal complaint on August 31, 2018. Doc. 1. Defendants were indicted by a federal grand jury in September 2018 and again by superseding indictment in March 2019. Docs. 24, 84. Defendants are currently indicted on seven counts: (1) Conspiracy to Provide Material Support to Terrorists in violation of 18 U.S.C. § 2339A; (2) Providing Material Support to Terrorists in violation of 18 U.S.C. §§ 2339A & 2; (3) Conspiracy to Murder an Officer or Employee of the United States in violation of 18 U.S.C. § 1117; (4) Conspiracy to Commit an Offense Against the United States in violation of 18 U.S.C. § 371; (5) Possessing a Firearm While Unlawfully in the United States in violation of 18 U.S.C. §§ 922(g)(5) & 2; (6) Conspiracy to Commit Kidnapping in violation of 18 U.S.C. § 1201(c); and (7) Kidnapping in violation of 18 U.S.C. §§ 1201(a) & 2.[2] Doc. 85 at 1. Defendants are alleged to have kidnapped minor child John Doe from Georgia and transported him to Taos County, New Mexico, resulting in his death.[3] *Id.* at 7-9. It is also alleged Defendants built and maintained a training compound on Lot 28 in Taos County, including a firing range, to "prepare for attacks on government military and other institutions." *Id.* at 2-4. Law enforcement recovered ten firearms, approximately five-hundred rounds of ammunition, approximately twelve high-capacity

---

[1] Since the Court concludes Defendants lack Fourth Amendment standing to challenge the execution of the search warrant by the TCSO, the Court need not and does not address other arguments raised by Defendants in their suppression motion.

[2] Defendants Jany Leveille and Lucas Morton were indicted on all counts. Defendants Hujrah Wahhaj and Subhanah Wahhaj were indicted on all counts except for Count Three, Conspiracy to Murder an Officer or Employee of the United States. Defendant Siraj Ibn Wahhaj was indicted on all counts except for Conspiracy to Commit Kidnapping and Kidnapping in Counts five and six. Doc. 85 at 1-9.

[3] Defendant Siraj Ibn Wahhaj, the biological father and parent of John Doe, cannot be charged with kidnapping under 18 U.S.C. § 1201(a).

magazines, a bullet-proof vest, and other assorted firearms accessories from Defendants' compound. *Id.* at 9-10.

## I.     Land Dispute Between Defendants and Jason Badger

Whether Defendants have standing to challenge TCSO's search requires examining what real property interest and reasonable expectation of privacy, if any, Defendants had in Lot 28 at the time of the search. The following facts are taken from the Court's March 28, 2023, evidentiary hearing and the Parties' exhibits devoted to the issue of Defendants' standing.

### A.  Development of the Land Swap Purchase Agreement

In April 2016, Defendant Lucas Morton entered into an installment real estate contract to purchase Lot 29, Unit 2, in the Costilla Meadows Subdivision in Taos County[4] ("Lot 29") from James Kohlmann. Doc. 690-1. The contract was recorded in the office of the Taos County Clerk on April 28, 2016. *Id.* The deed to Lot 29 was held in escrow while Morton made payments to Kohlmann. Doc. 708 at 110. Eventually, Morton paid Kohlmann the amount he owed on the contract, and the deed to Lot 29 was released to him. *Id.* at 112-13. Morton lost the deed and failed to record it. Doc. 689-9 at 1.[5]

In October 2017, Jason and Tanya Badger purchased Lot 28, Unit 2, in the Costilla Meadows Subdivision for around $8,500 to $9,000, also from James Kohlmann. Doc. 708 ("Hearing Transcript") at 29. Lot 28 is a 9.621-acre parcel of the same size and shape as Lot 29. Doc. 690-3. Lot 28 is located directly east of Lot 29. The two parcels share a border. *Id.* The Badgers found an internet ad for the property and bought it sight unseen with the assistance of a real estate agent. Doc. 708 at 28-29. The Badgers paid the full purchase price, received a warranty

---

[4] The Costilla Meadows Subdivision map reveals that the subdivision is located on the far north border of Taos County at the New Mexico/Colorado border.

[5] Morton later obtained a replacement deed to Lot 29 from James Kohlmann in January 2018 with the assistance of attorney Christopher Stachura. Doc. 690-8.

deed from the seller, and recorded it with Taos County on October 26, 2017. Doc. 688-10. At the time, the Badgers lived in nearby Cerro, New Mexico. They intended to use Lot 28 as a vacation property and build a veterans' nature retreat on the land. Doc. 708 at 35.

Jason Badger ("Badger") visited Lot 28 for the first time in October 2017, shortly after he purchased it. *Id.* at 31. He observed that the Costilla Meadows subdivision was largely undeveloped. *Id.* at 160. There were a "handful of houses" and buildings scattered about different lots in the Costilla Meadows subdivision, but only one house appeared to be occupied. *Id.* at 18-19. Many of the lots in the area were vacant and covered in sagebrush. Nevertheless, Badger was able to locate Lot 28 by using a map of the subdivision he received when he purchased the property with road names and a compass bearing. *Id.* at 34. Badger also observed that Lot 28 had one-and-a-half-foot tall wooden stakes at each corner to demarcate the property boundary. *Id*. at 36.

The Badgers did not immediately build on Lot 28 or otherwise develop it. *Id.* at 36-37. However, Badger continued to drive up from his home in Cerro every two or three weeks to check on the property. *Id.* at 35. In or around December 2017, Badger made one of his usual trips to Lot 28 and discovered Defendants and their twelve children had moved onto Badger's land. *Id.* at 84-85. Badger told Lucas Morton and Siraj Wahhaj they were on the wrong lot. *Id.* at 85-87. He showed Defendants his land survey and the Costilla Meadows subdivision lot map to prove they were on the wrong lot. *Id.* at 85. Badger also took one of the older teenage boys to the boundary between Lots 28 and 29 to show him the boundary stakes. *Id.* at 85-86. The stakes were marked, "Unit 2, Lot 29." *Id.* at 42. The teenage boy confirmed to Siraj Wahhaj that "Lot 29 was over there," on the other side of the boundary stakes. *Id.* at 43.

Badger and Defendants talked through the situation and came to a preliminary oral agreement to swap lots. *Id.* at 43-44. Badger understood he was within his rights to tell Defendants

to relocate to their land on Lot 29, but he was concerned about displacing Defendants' young children during the cold northern New Mexico winter. *Id.* at 87. At that time, Defendants had already constructed some kind of "makeshift" shelter on Lot 28. Defendants had a camper trailer "halfway buried in the ground, and it had [a] plastic canopy over [it]." *Id.* at 40. Adjacent to the camper was a makeshift structure built from two-by-fours and plastic tarp, large enough for Defendants to walk in and out of. *Id.* at 41. Badger "could tell . . . they didn't have the best of conditions to stay warm . . . and dry in." *Id.* at 44. He "didn't really want to throw them out in the cold." *Id.* Badger and Lucas Morton therefore agreed to swap ownership of Lots 28 and 29, provided that Morton paid all of the court costs, filing fees, and transaction fees required to finalize the deal. *Id.* at 89. Badger permitted Defendants to remain on Lot 28 while the land swap was being negotiated. *Id.* at 44, 90. Badger testified that he does not recall whether Morton permitted him to use and possess Lot 29 during that time. *Id.* at 44.

Shortly after making their oral agreement, the parties began the process of effectuating the land swap by written contract.[6] Jason Badger contacted the realtor who helped him purchase Lot 28. *Id.* at 45. The realtor referred Badger to attorney Christopher Stachura of the Dogasa Law Offices in Taos, New Mexico. *Id.* at 46. Stachura assisted the parties in drafting a document entitled: "Real Estate Sale and Purchase Agreement" (hereinafter "Purchase Agreement"). Doc. 690-9. Pursuant to the Purchase Agreement, Lucas Morton agreed to sell the Lot 29 warranty deed to the Badgers in exchange for the specified "purchase price," the warranty deed to Lot 28. *Id.* at 1. The agreement further specified that the seller, Lucas Morton, "will pay all closing costs associated with this transaction . . . ." *Id.* at 2. The agreement also stated the "closing date shall be

---

[6] The Court refers to Jason Badger, Tanya Badger, and Lucas Morton as "the parties" when referencing the Purchase Agreement and the surrounding negotiations. To avoid confusion, the Court refers to the parties in this case, the United States and Defendants, as "the Parties."

on or before June 3, 2018 at New Mexico Title." *Id.* The agreement contained a termination clause: "Time is of the essence hereof. If any payment or any other condition hereof is not made, tendered or performed by either the Seller or Purchasers as herein provided, then this Agreement, at the option of the party who is not in default, may be terminated by such party." *Id.* The agreement further stated that if any defects in the title making process were not corrected prior to the closing date of June 3, 2018, the "Agreement shall terminate." *Id.* The Purchase Agreement was signed by both parties in April 2018. *Id.* at 3.

### B.  Breakdown in Negotiations and Termination of the Purchase Agreement

After the parties executed the Purchase Agreement in late April or May of 2018, Jason Badger performed some preparatory work in anticipation of taking possession of Lot 29 when the parties closed. Doc. 708 at 86. Badger used a tractor tire to clear sagebrush for an entry road onto Lot 29. *Id.* at 49. He also installed four green T-posts at each corner of Lot 29's boundary. *Id.* At the time, Badger saw the Purchase Agreement as a "simple swap," and he "didn't see a reason for it not going through." *Id.* at 91. However, Badger elected not to build anything on or occupy Lot 29 until the parties closed on the Purchase Agreement and he received the title. *Id.* at 86-87.

Shortly thereafter, Badger learned through online research that Defendants Lucas Morton and Siraj Wahhaj were wanted out of the State of Georgia. *Id.* at 57-58. This discovery changed Badger's perception that the land swap was likely to succeed. *Id.* at 91. After making the discovery, Badger went to the Taos County Sheriff's Office in person and reported that he knew Defendants were on his property. *Id.* at 59. TCSO Sergeant Jason Rael met with the Badgers at their home to discuss the case. *Id.* Sergeant Rael would continue to communicate with Badger concerning the TCSO's investigation until Defendants' arrests in August 2018.

On May 8, 2018, Jason Badger informed Lucas Morton by text message that the final closing costs for their real estate swap would be $1,057.17, due at signing. Doc. 708 at 6; Govt. Ex. 15 at 1.[7] Morton responded the next morning that he would not have the money until the end of May or the first day of June at the latest. *Id.* at 2. Badger replied two days later that the closing of the Purchase Agreement was set for May 31, 2018. *Id.* at 3. Twenty days later, on the morning of May 31, Morton texted Badger stating he did not have the money to cover closing costs. *Id.* at 4. Morton instead proposed that the parties "go around" the closing costs by filing paperwork directly with the court, based on advice he received "from a paralegal friend." *Id.* Badger rejected Morton's proposal and told him they needed to go through the title company, which had already preformed the work needed to execute the land swap. *Id.* at 5. Badger also told Morton he had waited long enough for the land swap to be completed. *Id.* at 6. Morton did not respond to Badger's message, pay the closing costs, or appear for the closing that day. Doc. 708 at 90. The parties failed to close by June 3, 2018, at which time the Purchase Agreement expired under the termination clause. Doc. 690-9 at 2.

### C.  The Badgers' Attempts to Remove Defendants from Lot 28

The Badgers pursued several avenues to remove Defendants from their property after the Purchase Agreement terminated. Defendants continued to occupy Lot 28 without the Badgers' consent until August of 2018 when the TCSO executed its search warrant and arrested Defendants.

First, Badger communicated directly with Morton by text message and made multiple demands that Defendants move off Lot 28. On June 7, 2018, Badger sent a text message to Morton asking if he had received Badger's previous text messages about completing the land swap through

---

[7] The Court admitted United States' Exhibit 15 at the March 28, 2023, evidentiary hearing. Exhibit 15 was not attached to the United States' Proposed Findings of Fact and Conclusions of Law (Doc. 688). It consists of eleven pages of SMS text messages between Lucas Morton and Jason Badger.

the title company. Govt. Ex. 15 at 7. Morton replied that he had, but he needed more time to get the money for closing. *Id.* at 8. The next day, Badger texted Morton: "You need to be off by [the] end of next week." *Id.* at 9. Badger sent a second text specifying the date: "By June 15th." *Id.* at 10. Morton did not respond to either text. Badger again texted Morton on June 11 and asked if Defendants were able to start moving their stuff off Lot 28. *Id.* at 11. Morton again did not respond. Badger intended for the text messages to provide Morton with notice that Defendants had to leave Badger's property. Doc. 708 at 91. Morton, when testifying at the evidentiary hearing, confirmed he received Badger's text messages. *Id.* at 200.

Second, the Badgers attempted to remove Defendants by civil legal process. On June 12, 2018, Jason and Tanya Badger filed a form entitled "Petition by Owner for Restitution" with the Taos County Magistrate Court, believing it to be the correct form to use to remove trespassers from their land. Doc. 689-11; Doc. 708 at 92. Attached to the form was a copy of the Badgers' warranty deed for Lot 28, the parties' Purchase Agreement, and a notice prepared by attorney Christopher Stachura stating that the Purchase Agreement was terminated when the parties failed to close by June 3, 2018. Doc. 689-11. Also attached was a summons ordering Morton to appear in Taos County Magistrate Court on June 27, 2018. Lucas Morton was served in person on June 18, 2018. *Id.* at 9. Defendants failed to appear for the court date on June 27. Doc. 708 at 77. The action was ultimately dismissed for lack of jurisdiction because it was filed in magistrate court, rather than state district court. Doc. 689-11 at 14. The magistrate court did not reach the merits of the eviction issue. Badger intended to refile an eviction suit in the proper court but neglected to do so before Defendants were removed from his property in early August. Doc. 708 at 93.

Third, the Badgers sought assistance from state law enforcement to remove Defendants. On June 30, 2018, just a few days after the Badger's civil action was dismissed, Tanya Badger

phoned the New Mexico State Police ("NMSP"). Doc. 738-1. Tanya Badger told Officer Bryan

Donis that "she was told by a judge to contact NMSP to have the people living on her land served

with a trespass notice." Doc. 738-1. Officer Donis drove to Lot 28 to meet with Lucas Morton. *Id.*

at 2. Morton came out to meet Officer Donis at the road. *Id.* Defendants' driveway was blocked

off with rope. *Id.* Morton "postured and behaved as if he did not want [Officer] Donis to go onto

the property." *Id.* Morton told Officer Donis he inherited Lot 28 from his creator and the Badgers'

civil case was dismissed. *Id.* Officer Donis left without serving Morton with a trespass notice. Doc.

708 at 73-74. On July 2, 2018, NMSP advised Tanya Badger to contact the TCSO because they

were the lead investigating agency in the apprehension of Siraj Ibn Wahhaj. Doc. 738-1 at 1.

The Badgers turned to TCSO for assistance in removing Defendants from their property.

In May 2018, shortly after Jason Badger learned Sirraj Wahhaj was wanted, Badger signed a

consent form authorizing TCSO to conduct a search of Lot 28. Doc. 708 at 138. However, TCSO

was hesitant to rely solely on Badger's consent to execute a search. At that time, the closing date

for the Purchase Agreement had not passed and there was still a possibility for a successful land

swap. *Id.* at 140. Further, Jason Badger would need to be present to execute a consent search, and

TCSO had concerns about his safety. *Id.* at 188. TCSO therefore elected to obtain and execute a

search warrant. *Id.* To secure evidence in support of the search warrant, TCSO Sergeant Jason Rael

asked Badger if he would be willing to wear a button camera and meet with Defendants on Lot 28.

*Id.* at 141. Badger initially agreed to wear the camera, but ultimately choose not to out of concern

for his own safety. *Id.* at 61.

After further investigation, TCSO submitted a probable cause affidavit and had a search

warrant issued by an Eighth Judicial District, County of Taos, New Mexico District Court Judge.

Doc. 471-1. On August 3, 2018, TCSO executed the search warrant on Lot 28. Doc. 708 at 160.

Officers recovered ten firearms, approximately five-hundred rounds of ammunition, approximately twelve high-capacity magazines, a bullet-proof vest, and other assorted firearms accessories from the compound. *Id.* at 9-10. Defendants were arrested and taken into custody. Docs. 2-6. The Badgers were able to retake possession of Lot 28 in August of 2018. Doc. 708 at 94. They spent several weeks cleaning up what Defendants left behind and eventually sold the property at a loss. *Id.* at 97.

On October 20, 2022, Defendants filed a joint Motion to Suppress "all evidence derived" from TCSO's execution of the search warrant on Lot 28. Doc. 471. The United States responded that Defendants lack Fourth Amendment standing to challenge the search because they did not have a reasonable expectation of privacy in Lot 28, which they wrongfully occupied without the consent of Jason and Tanya Badger. Doc. 566 at 16-17. On March 28, 2023, the Court held an evidentiary hearing to address whether Defendants had standing to challenge the search. The Parties filed proposed findings of fact and conclusions of law on the issue of standing. Having reviewed the record, the Parties' arguments, and the applicable law, the Court concludes Defendants failed to meet their burden to establish standing to challenge TCSO's alleged Fourth Amendment violations during the search.

## LEGAL STANDARD FOR FOURTH AMENDMENT STANDING

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." U.S. Const. amend. IV. The Fourth Amendment right is "a personal right that must be invoked by an individual." *Minnesota v.* Carter, 525 U.S. 83, 88 (1998). Thus, a "defendant may not challenge an allegedly unlawful search or seizure unless he demonstrates that his own constitutional rights have been violated." *United States v. Rubio-Rivera*, 917 F.2d 1271, 1274 (10th

Cir. 1990) (citation omitted). Further, "a district court may not suppress evidence unless the defendant has met his burden of proving that the challenged search or seizure infringed on his personal fourth amendment interests." *Id.* (citation omitted).

The Tenth Circuit has referred to the issue of whether a search implicates a particular defendant's Fourth Amendment rights as "standing." *Rubio-Rivera*, 917 F.2d at 1274. Standing in the Fourth Amendment context is not jurisdictional in nature, but rather refers to the concept that a defendant may not seek to exclude evidence based upon the government's exploitation of someone else's Fourth Amendment rights. *United States v. White*, 584 F.3d 935, 952 n.7 (10th Cir. 2009). The concept of standing is thus "invariably intertwined" with the substantive law governing when a search implicates the Fourth Amendment. *Rakas v. Illinois*, 439 U.S. 128, 139 (1978).

The United States Supreme Court recognizes two tests to determine when a government search implicates a defendant's Fourth Amendment rights. First, under traditional trespass-based analysis, a Fourth Amendment search occurs "when the Government obtains information by physically intruding on persons, houses, paper, or effects." *Florida v. Jardines*, 569 U.S. 1, 5 (2013). Second, a Fourth Amendment search can also occur when a defendant's reasonable expectation of privacy was invaded by government action. *Katz v. United States*, 389 U.S. 347, 353 (1967) This inquiry requires determining "whether the individual, by his conduct has exhibited an actual (subjective) expectation of privacy," and "whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (citing *Katz*, 389 U.S. at 361). A defendant's affirmative showing under either test is sufficient to implicate the Fourth Amendment. *Jardines*, 569 U.S. at 11 ("The *Katz* reasonable-expectations test has been added to, not substituted for, the traditional property-based understanding of the Fourth Amendment.").

11

In sum, to establish Fourth Amendment standing, Defendants must show their "own constitutional rights" have been infringed by a government search. They may do so under either the *Jardines* trespass test or the *Katz* reasonable expectation of privacy test. *Rubio-Rivera*, 917 F.2d at 1274.[8]

## DISCUSSION

Defendants ask the Court to exclude all evidence "derived as a result of" TCSO's August 3, 2018, search of Lot 28. Doc. 471 at 1. The United States contends Defendants do not have Fourth Amendment standing to challenge the search because they resided on the Badgers' property without the Badger's consent. The Court must answer two questions to determine if Defendants have standing: First, did Defendants have a real property interest in Lot 28 on August 3, 2018, such that TCSO's search constituted a physical trespass onto their home? Second, if the search was not a physical trespass onto their home, did Defendants have a subjective expectation of privacy in Lot 28 that society is prepared to recognize as objectively reasonable? The Court concludes the answer to both questions is no. Defendants therefore lack standing to challenge TCSO's search.

## I.     Defendants failed to show a sufficient property interest in Lot 28 on August 3, 2018, to assert a Fourth Amendment violation under the *Jardines* trespass test.

"At the [Fourth] Amendment's 'very core' stands 'the right of a man to retreat into *his own home* and there be free from unreasonable governmental intrusion.'" *Jardines*, 569 U.S. at 6 (citation omitted) (emphasis added). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a *third person's*

---

[8] The Parties devote most of their briefing to the *Katz* reasonable-expectation-of-privacy test. However, Defendants assert their property interest in Lot 28—an oral or implied tenancy—entitles them to Fourth Amendment standing. The Court will therefore also address Defendants' standing to assert a substantive Fourth Amendment violation under the *Jardines* physical trespass test.

*premises or property* has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134 (emphasis added).

It is undisputed that Jason and Tanya Badger were the recorded owners with title to Lot 28 at the time of the search. Doc. 688-10. It is also undisputed that the parties' Purchase Agreement to swap ownership of Lots 28 and 29 was terminated by law before the search. Doc. 690-11 at 8. However, Defendants argue the parties' conduct and expectations during the pendency of the Purchase Agreement created a landlord-tenant relationship between the Badgers and Defendants. The Court is not persuaded.

It is a defendant's burden to adduce "facts at the suppression hearing indicating that *his own rights* were violated" by a challenged search. *United States v. Erwin*, 875 F.2d 268, 270 (10th Cir. 1989) (emphasis added) (citation omitted). Defendants assert their own rights were violated by TCSO's physical intrusion because they were the Badgers' tenants at that time. Defendants have the burden to support their theory of standing by presenting facts sufficient to support a finding that a tenancy existed at the time of the search. The Court concludes Defendants failed to meet their burden.

### A.   Defendants' property interest in Lot 28, if any, was terminated by Jason Badger before August 3, 2018.

"Tenancy" refers to the "possession or occupancy of land under a lease; a leasehold interest in real estate." *Black's Law Dictionary* (11th ed. 2019). "Generally speaking, a lease is an agreement under which the owner gives up the possession and use of his property for a valuable consideration and for a definite term. At the end of the term the owner has the absolute right to retake, control, and use the property." *Transamerica Leasing Corp v. Bureau of Revenue*, 1969-NMCA-011, ¶ 16, 450 P.2d 934, 937. Defendants argue they entered into an oral lease with the

Badgers in which Lucas Morton tendered possession of Lot 29 to the Badgers as "rent and consideration" in exchange for Defendants' occupation of Lot 28.

The Court finds that Defendants failed to show a lease agreement or tenancy existed between them and the Badgers. Defendants failed to cite to any legal authority supporting their argument that an oral tenancy was created. Further, the record is devoid of any evidence suggesting there was at any time a written or oral lease agreement between the Badgers and Morton. In fact, the evidence in the record contradicts Defendants' theory. Jason Badger stated he does not recall creating any oral lease and he was never Defendants' landlord. Doc. 708 at 79. Badger also stated he agreed to permit Defendants to remain on Lot 28 only while the Purchase Agreement was pending and viewed them as trespassers at the time of the search. *Id.* at 44 and 82. The Purchase Agreement makes no mention of a tenancy. *See* Doc 690-9. It also states Lucas Morton "agrees to give possession of [Lot 29]," which Defendants now claim to be a rent payment, "on the date of closing." *Id.* at 2. Defendants failed to attend the closing, and the agreement terminated by its own terms. Doc. 708 at 90. The title to Lot 29 was never transferred to the Badgers. Jason Badger stated he does not recall Defendants explicitly granting him use and possession of Lot 29 before then. Doc. 101 at 44. The Badgers' conduct shows they were reluctant to occupy and build on Lot 29. Doc. 708 at 50. Jason Badger placed boundary stakes at the corners of Lot 29, cleared a path to access the lot, and then declined to occupy or build on Lot 29 "until some point after it became [his]." Doc. 708 at 48-50. The record contains no evidence the parties ever negotiated any type of lease, and it is not clear that Defendants' purported rent payment was ever tendered. It is

Defendants burden to set forth facts supporting their theory of standing, and they have not done so.[9]

Moreover, any property interest Defendants might have had in Lot 28 was subject to unilateral revocation by Badger. Even assuming the parties' conduct created an implied tenancy, it would have at most amounted to a tenancy at will, given the absence of a lease agreement with definite terms. *See* Restatement (Second) of Property, Land. & Ten. § 1.6 (1977) ("Where the parties enter into a lease of no stated duration and no periodic rent is reserved or paid, a tenancy at will is presumed."). A tenancy at will "endure[s] only so long as both the landlord and the tenant desire." *Id.* Alternatively, it might be argued that Jason Badger granted Defendants a license to remain on his land before the Purchase Agreement terminated. *See Quantum Corp. v. State Taxation and Revenue Dept.*, 1998-NMCA-050, ¶ 10, 956 P.2d 848, 851. (defining "license" as "permission by competent authority to do an act which, without such permission, would be illegal, [such as] a trespass . . ." and holding "[a] license does not create an interest in land; it is similar to a tenancy at will") (citations omitted). A license "may be revoked without notice and without cause, because . . . a licensee has no possessory interest in the property." *Tarin's, Inc. v. Tinely*, 2000-NMCA-048, ¶ 21, 3 P.3d 680, 688. In either case, Jason Badger had the authority to revoke Defendants permission to remain on Lot 28.

If Defendants had any interest in Lot 28, Jason Badger terminated it by revoking Defendants' permission to remain on Lot 28 well before TCSO's search on August 3, 2018. The Court could locate no New Mexico authority that imposes a specific notice requirement to terminate a tenancy at will. Moreover, revocation of a license does not require notice to the

---

[9] Defendants also argue their oral lease agreement was a "rental agreement" subject to the tenants of the New Mexico Uniform Owner Resident Relations Act, NMSA 1978 § 47-8-1, *et seq*. The Court need not address this argument because the Court finds no oral lease agreement existed.

licensee. Even so, the Badgers notified Defendants that permission to remain on Lot 28 was revoked in at least two separate ways, beginning nearly two months before TCSO's search. First, on June 8, 2018, Jason Badger notified Lucas Morton by text message that Defendants no longer had his permission to remain on Lot 28. Govt. Ex. 15 at 9. Badger sent two more text messages to the same effect the next day and a third text on June 11, 2018. *Id.* at 10-11. Lucas Morton confirmed he received Badger's texts. Doc. 708 at 200. Second, on June 18, 2018, Lucas Morton was served with the Badgers' civil lawsuit.[10] Accompanying the summons was documentation stating the Badgers were "lawfully entitled to possession" of Lot 28, and Defendants had breached the then-terminated Purchase Agreement. Doc. 689-11 at 1. The Badgers' notices of revoked consent were more than enough to terminate any possible property interest Defendants had in Lot 28 prior to TCSO's search.

The Court concludes Defendants did not establish that they had a real property interest in Lot 28 at the time of TCSO's search on August 3, 2018. There is no evidence that the parties created an oral lease agreement. If Defendants were ever implied tenants at will or licensees, Jason Badger terminated their interest by providing two forms of notice weeks before TCSO's search. The record indicates that only the Badgers had a real property interest in Lot 28 on August 3, 2018. From Defendants' perspective, TCSO's search was "a search of a third person's premises," and Defendants cannot establish a Fourth Amendment violation under the *Jardines* trespass test. *Rakas*, 439 U.S. at 134.

**II.    Defendants did not have a reasonable expectation of privacy in Lot 28 on August 3, 2018.**

---

[10] The Court rejects Defendants' contention that the lawsuit's dismissal for lack of jurisdiction supports standing. Service of the lawsuit upon Morton is relevant to show Defendants had knowledge that the Badgers revoked their permission to remain on Lot 28. The dismissal does not affirmatively confer positive property rights or support a reasonable expectation of privacy.

Having concluded Defendants lack standing to challenge TCSO's search of Lot 28 as a physical trespass upon their own property, the Court turns to whether Defendants have standing to challenge the search as an intrusion upon their reasonable expectation of privacy in Lot 28. Defendants argue they had a reasonable expectation of privacy in Lot 28 because they "occupied, possessed, enjoyed and improved the Property for more than six months and exercised the right to exclude others by virtue of their tenancy." Doc. 725 at 27. The United States contends Defendants had no expectation of privacy that society is prepared to recognize as reasonable because they wrongly occupied the Badgers' property and "refused to leave despite being asked, told, and sued by the true owners." Doc. 719 at 49. The Court agrees with the United States that Defendants had no expectation of privacy that society is prepared to recognize as reasonable.

A "Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001). A reasonable expectation of privacy is one that "has a source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *United States v. Jones* 565 U.S. 400, 408 (2012) (citation omitted). "While ownership or lawful possession is not determinative under the *Katz v. United States* reasonable-expectation-of-privacy test, it is often a dispositive factor." *Ysasi v. Brown*, 3 F. Supp. 3d 1088, 1132 (D.N.M. 2014) (citation omitted). Other courts have held defendants have no reasonable expectation of privacy in property they do not own or have permission to occupy. *See Amezquita v. Hernandez-Colon*, 518 F.2d 8, 11 (1st Cir. 1975) (stating squatter's claim to reasonable expectation of privacy was "ludicrous" because they "knew they had no colorable claim to occupy the [searched] land," and had been asked to leave twice); *see also United States v. Hunyady*, 284 F. Supp. 2d 755, 759 (E.D. Mich. 2003) (holding tenant at

sufferance who knew he was in wrongful possession of property had no reasonable expectation of privacy; "[t]o conclude otherwise would encourage the wrongful possession of property").

The Court need not address whether Defendants displayed a subjective expectation of privacy because the evidence is woefully inadequate to establish Defendants had an expectation of privacy in Lot 28 that society is prepared to recognize as reasonable. As discussed, Defendants had no ownership or property interest in Lot 28 at the time of the search. They never had title to Lot 28. Their agreement with the Badgers to acquire Lot 28 terminated two months before TCSO's search. They had no property interest by virtue of a tenancy or license at the time of the search. In the Court's view, Defendants' lack of ownership and right to lawfully possess Lot 28 strongly suggests their expectation of privacy in Lot 28 is not objectively reasonable. Furthermore, Defendants were notified in several ways that they no longer had permission from the rightful owners to remain on Lot 28. Lucas Morton acknowledged receiving Jason Badger's texts to get off his land. Morton was served with notice of the Badgers' civil eviction suit. The Badgers called a NMSP officer to confront Defendants on Lot 28 and serve them with a trespass notice. For the same reasons Defendants have no standing to assert Lot 28 is their Fourth Amendment "home," the Court concludes Defendants likewise failed to demonstrate an expectation of privacy in Lot 28 "that society recognizes as reasonable." *Kyllo*, 533 U.S. at 33.[11]

## CONCLUSION

For the foregoing reasons, the Court concludes Defendants lack Fourth Amendment standing to challenge TCSO's August 3, 2018, search of Lot 28. Defendants failed to establish that TCSO's search was a physical trespass on their own property pursuant to *Jardines*. Defendants

---

[11] Defendants' occupation, possession, and "improvements" to Lot 28 do not support an objectively reasonable expectation of privacy after Defendants attained knowledge that the Badgers revoked their consent for Defendants to remain on their land. *Amezquita*, 518 F.2d at 11.

also did not have an expectation of privacy in Lot 28 that society recognizes as reasonable.

Defendant's Joint Motion to Suppress Evidence (Doc. 471) is therefore **DENIED**.


      **IT IS SO ORDERED.**

                                        WILLIAM P. JOHNSON
                                        CHIEF UNITED STATES DISTRICT JUDGE