**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

   **Plaintiff,**

**vs.**            **No. 1:18-CR-02945-WJ**

**JANY LEVEILLE, et al.,**

   **Defendants.**

## <u>UNOPPOSED MOTION FOR SPECIAL JURY QUESTIONNAIRE AND ENLARGED JURY PANEL</u>

   Defendant Subhanah Wahhaj, through counsel, The Law Office of Ryan J. Villa, by Ryan J. Villa, and Justine Fox-Young, PC, by Justine Fox-Young, joined by all Defendants, respectfully requests the Court require prospective jurors to complete a special jury questionnaire (SJQ) in advance of the trial currently scheduled for September 25, 2023. The special questionnaire should be issued to the venire and returned before voir dire. A draft of the proposed SJQ is attached here for the Court's consideration as **Exhibit 1**. Ms. Wahhaj also requests the Court empanel a 200-person venire, to ensure that an unbiased jury can be selected in this matter. Due to the high publicity this case has received, as well as the nature of the charges, which include terrorism and kidnapping resulting in death, an SJQ and 200-person venire are necessary to ensure Ms. Wahhaj's right to a fair jury under the Sixth Amendment. Defense counsel have consulted with counsel for the government, Assistant United States Attorney Kimberely Brawley, who indicates the government has no opposition to the request for a 200-person jury panel. Ms. Brawley further indicates that the government is not opposed to the general idea of a supplemental questionnaire and does not object to many of the proposed questions. However, the United States has some objections to some of the questions and it intends to file those objections by the July 7, 2023 Response deadline imposed by the Court. *See* Order [Doc. 789].

**RELEVANT BACKGROUND**

As the Court is aware, this case involves allegations of terrorism and kidnapping resulting in death. *See* Superseding Indictment [Doc. 85]. The Superseding Indictment specifically alleges that Defendants conspired to provide material support and resources, including currency, training, weapons and personnel, knowing and intending that they were to be used to prepare for and carry out attacks to kill federal employees and officers. *See* Doc. 85 at 2. No federal employees or officers were killed, and no actual attempt to kill occurred. The plot to kill federal officials was premised on A.G., who was deceased, coming back to life as Jesus Christ during the end of days and potentially directing Defendants to attack government entities. *See* U.S. Response to Motion for Severance, at 15 [Doc. 718].

Count 1 charges Conspiracy to Provide Material Support to Terrorists, contrary to 18 USC § 2339A. Count 2 charges a substantive count of Providing Material Support to Terrorists pursuant to the same statute. In the overt acts for Count 1, the Indictment alleges that Defendants:

> Did conspire, combine, confederate, agree, and act interdependently with each other to provide material support and resources, including currency, training, weapons, and personnel, knowing and intending that they were to be used in preparation for and in carrying out attacks to kill officers and employees of the United States….As part of a common plan [Defendants] maintained a training compound to prepare for attacks on government, military, and other institutions.

Superseding Indictment, at 2, ¶ (A)(1) [Doc. 85]. The manner and means of the conspiracy according to the indictment included gathering firearms and ammunition, *id.* at ¶ (B)(2), transporting personnel and firearms across state lines, *id.* at ¶ (B)(3), constructing and maintaining a training compound, *id.* at ¶ (B)(4), storing firearms and ammunition on the training compound, *id.* at ¶ (B)(5) and constructing and maintaining a firing range and engaging in firearms and tactical training, *id.* at ¶ (B)6. The overt acts of the conspiracy include building the training compound, *id.* at 4, ¶ 12, building a firing range on the compound, ¶ 14, possessing and shooting firearms on

2

the compound, ¶¶ 16-20, and training in firearms and tactics, ¶ 22. Critically, the last overt act for

Count 1 alleges that Ms. Leveille and Siraj Wahhaj "instructed persons, including other occupants

of the training compound to be prepared to engage in jihad, to die as martyrs, and to engage in

violent acts, including killing Federal Bureau of Investigation employees, government officials,

and military personnel." *Id.* at ¶ 23.

According to the Criminal Complaint filed on August 31, 2018, a witness described as John

Doe 2 said that Defendant Siraj Ibn Wahhaj "wanted to get an army together and train them to

conduct what he called 'jihad.'" *See* Doc. 1, ¶ 21. According to this witness, "jihad meant to kill

people for Allah." *Id.* The Complaint goes on to explain that "Both John Doe 2 and Ibn were

training in arms and weapons at the Compound." Count Three charges Conspiracy to Murder an

Officer or Employee of the United States and Counts Six and Seven charge Conspiracy to Commit

Kidnapping and Kidnapping resulting in death.

In the government's response to the Motion to sever the terrorism and kidnapping counts,

the government sets forth the nature of their case against Defendants:

> The ongoing kidnapping of [A.G.] constitutes not just common evidence and common threads amongst the five Defendants to the rest of the charges, but it constitutes the very heart of the material support for terrorism and conspiracy to murder charges. The evidence establishes that [A.G.]'s kidnapping and Defendants' movement from Georgia to New Mexico was motivated by Leveille's assertion that [A.G.] was her biological child, that [A.G.] was possessed by demons, that Leveille was Mary mother of Jesus, and that [A.G.] was Jesus. The evidence further establishes that Defendants' material support was motivated by [A.G.]'s death and Leveille's assertion that [A.G.] would be resurrected and lead them in jihad, to include the murder of federal employees and others. The Defendants spent nine months preparing for this war. They mummified [A.G.]'S body in anticipation of his resurrection; established a compound that included, among other features, a firing range and tactical training ground; engaged in weapons and tactical training; provided weapons and tactical training to some of the children; attempted to recruit another and to obtain his financial support and additional weapons for purposes of becoming a "martyr" upon [A.G.]'s resurrection. All of this was done according to the community structure and doctrine articulated in Leveille's journals or testaments which were centered on [A.G.]'s resurrection. [A.G.], both when he

lived and after he died, was just a prop in Defendants' scheme to prepare for and engage in jihad. There is thus no way to separate the kidnapping from the material support and other charges—they arise from a common series of intertwined facts.

All five Defendants kidnapped [A.G.] purportedly because he was Leveille's biological son, to rid [A.G.]'s body of demons and to follow him as Isa (the Islamic name for Jesus), the true son of Defendant Leveille (called "Maryam" by the Defendants). This eventually included the Defendants' plan to follow Isa into war against the corrupt institutions the group was targeting. Although Siraj was under investigation for potential terrorism-related offenses prior to [A.G.]'s kidnapping, the charges against the Defendants all stem from and relate to [A.G.]'s kidnapping and transport to New Mexico. It is important to note that [A.G.]'s kidnapping was not some one-minute offense, completed at the time Siraj lied to his wife to take [A.G.] in order to bring him to Leveille. The kidnapping offense was ongoing throughout the Defendants' concealment of [A.G.], almost the entire time during which the Defendants' material support offenses and conspiracy were ongoing and directly tied to [A.G.]. At the same time the Defendants planned and trained on their homemade firing range for the coming war, they were washing and observing [A.G.]'s corpse and hiding from all who would betray their location to the authorities. Both lines of actions were for the same end: to keep [A.G.] with them until his expected resurrection, after which he would lead their jihad on what they deemed to be corrupt institutions, including federal agencies and the military.

U.S. Response to Motion for Severance, at 15-16 [Doc. 718]. While Defendants deny these accusations, they are sensational and will evoke strong feelings and emotions in many prospective jurors.

This case has received intense media coverage from local media across the state including the Albuquerque Journal, the Santa Fe New Mexican, the Las Cruces Sun News, and all of the local television news stations in the State including KOB, KRQE, and KOAT. The coverage from these and other smaller outlets has been extensive and ongoing from 2018 through the present. The case has also received national media coverage, including from CNN, NBC News, Reuters, U.S. News & World Report, The New York Times, USA Today, CBS News from the beginning of the case and earlier this year. As the case gets closer to trial, additional media coverage is anticipated. Because of the nature of the charges and intense media coverage, Ms. Wahhaj requests the Court

issue the proposed SJQ and empanel a 200-person venire to ensure that an unbiased jury can hear the charges.

## ARGUMENT

"It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C.A. § 1861. As an instrument of public justice, a "jury [must] be a body truly representative of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975). "When the Court empanels a jury, jury services sends a qualifying questionnaire to the venire and a juror questionnaire to the venire. The Court, in special circumstances, will also send a supplemental, or special, juror questionnaire to the venire." *United States v. Baca*, 2019 WL 251737, at *2 (D.N.M. 2019) (J. Browning). Special "juror questionnaires further screen potential jurors, and the Court uses such questionnaires when the Court and the parties are particularly concerned whether the case's facts or external factors … will influence jurors." *Id*. (citation omitted). Such case facts have been found to include "personal, sensitive, or controversial matters" or matters that tend to involve "governmental authority, drug use, health risks… incest, [or the] sexual abuse of [a] child." *Id*. (citations omitted).

To be meaningful, the adequacy of voir dire examination must allow the defendant an opportunity to make reasonably intelligent use of his peremptory challenges and challenges for cause." *United States v. Sandoval*, No. 04-cv-2362-JB; 2006 WL 1304955, at *2 (D.N.M. Feb. 1, 2006) (citing *United States v. Rucker*, 557 F.2d 1046, 1049 (4th Cir.1977)).  "[V]oir dire is within the sound discretion of the trial court, and the court's exercise of that discretion will not be disturbed, absent a clear showing of abuse." *Id.* (quoting *United States v. Whitt*, 718 F.2d 1494, 1497 (1983) (citations omitted). This Court has recognized that it has broad discretion in

overseeing and managing the jury selection procedure. *Id.* (quoting *United States v. Morris*, 623 F.2d 145, 151 (10th Cir. 1980).

This Court has noted that a juror questionnaire can be "a useful tool to more easily facilitate voir dire." *Lowery v. City of Albuquerque*, 09-cv-0457-JB-WDS; 2012 WL 1372273, at *5 (D.N.M. Apr. 11, 2012). The Court has ordered prospective jurors to complete juror questionnaires before voir dire as it found this would aid the Court and the parties in obtaining information that will be helpful for the exercise of early cause and peremptory challenges and reduce unnecessary questioning during in Court in voir dire. *Lowery,* 2012 WL 1372273, at *5 (quoting *Sandoval*, 2006 WL 1304955, at *3). In *Lowery*, the Court noted how the questionnaire "will aid judicial economy by allowing the Court to use the limited time available for voir dire to more fully explore any issues revealed within the questionnaires." *Id.* The questionnaire will aid the Court and the parties in more effectively determining the existence and substance of challenges for cause, as well as assisting the parties in the exercise of their peremptory challenges.

In *Sandoval*, this Court permitted a jury questionnaire over the government's objection in a child sex abuse case. The Court reasoned:

> The proposed questionnaire will aid the Court and the parties in obtaining and receiving information that will be helpful for the exercise of early challenges for cause so that prospective jurors do not have to be subjected unnecessarily to questioning in Court in voir dire. The questionnaire will allow the prospective jurors the opportunity to retain some measure of privacy on the sensitive issues that arise in this case, such as sexual abuse, incest, gambling, and religious differences. The questionnaire will aid judicial economy by allowing the Court and the parties to use the often limited time available for voir dire to address more substantive matters. The questionnaire will also allow the prospective jurors to provide some information about necessary but more mundane lines of inquiry outside the courtroom, thereby relieving the Court of the need to convene to conduct questioning about such mundane matters. By addressing these mundane matters in the questionnaire, the Court will be able to use the time available for in person voir dire more efficiently. The questionnaire will aid the Court and the parties in more effectively determining the existence and substance of challenges for cause, and in

exercising those challenges, as well as assisting the parties in determining and exercising peremptory challenges.

*Id.* at 3.  The same considerations are in play here.

Although the character and quality of charges is different than in *Sandoval*, given the allegations in this case, much more exacting jury questioning will be required to explore potential bias than in a normal, run-of-the-mill voir dire.  The allegations of terrorism and kidnapping, and high-profile nature of the case will raise significant emotions in jurors and require delving into matters that may be very sensitive and private. As the Court recognized in *Sandoval*, a questionnaire can help jurors retain some privacy in answering questions of a sensitive nature.  A questionnaire is a far superior method to inquire into sensitive matters than voir dire in open court. Like in *Sandoval*, the proposed questionnaire will promote judicial economy during voir dire and help counsel for all parties identify peremptory and cause challenges.  Because there are five Defendants proceeding to trial, including two who represent themselves, voir dire could take longer and engender more questioning of prospective jurors. The proposed questionnaire will help streamline this process and limit the number of questions that need to be asked of each juror during voir dire.

Given the nature of the evidence expected to be introduced at trial in this case, the special jury questionnaire will assist the Court and the parties in screening potential jurors and help save time, mitigate the risk of unfair prejudice, and avoid the unnecessary embarrassment of prospective jurors. Because of the type of charges, it is also anticipated that many jurors will not be able to remain fair and impartial. Unlike the run of the mill felony case where 50-70 jurors might be sufficient to account for jurors who cannot be impartial, a much higher number is needed here. The parties estimate that 200 jurors will be necessary for the venire. Voir dire can be conducted in

waves due to space constraints in the courtroom, and it may be that a jury can be sat without conducting voir dire of all 200, but this number is appropriate given the circumstances of this case.

## CONCLUSION

For the reasons discussed above, Ms. Wahhaj respectfully requests that the Court require prospective jurors to complete a special questionnaire, attached as **Exhibit 1**, in advance of trial.

Respectfully submitted,
THE LAW OFFICE OF RYAN J. VILLA

*/s/ Ryan J. Villa*
Ryan J. Villa
5501 Eagle Rock Ave NE, Suite C2
Albuquerque, NM 87113
(505) 639-5709
ryan@rjvlawfirm.com

and

*/s/ Justine Fox-Young*
Justine Fox-Young
Justine Fox-Young, PC
5501 Eagle Rock Ave NE Ste C2
Albuquerque, NM 87113
(505) 796-8268
justine@foxyounglaw.com

*Attorneys for Defendant Subhanah Wahhaj*

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2023 a copy of the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

*/s/Ryan J. Villa*
RYAN J. VILLA