IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CRIMINAL NO. 18-2945-WJ |
| ) | |
| ) | |
| **JANY LEVEILLE,** ) | |
| ) | |
| Defendant. ) | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States submits its sentencing memorandum and requests this Court sentence the Defendant Jany Leveille (Leveille) to a term of incarceration of 17 years (204 months). Although the recommended sentence is less than the guidelines range of 300 months in the Presentence Report ("PSR," Doc. 1003), the sentence is within the range agreed to by the parties in their Rule 11(c)(1)(C) plea agreement. The United States does not object to the PSR's guidelines calculations or any other aspect of the report.

## BACKGROUND

The facts of this case are unusual, complicated, and well known to this Court. For purposes of sentencing in Leveille's case, the United States does not object to the offense conduct articulated in the PSR. Doc. 1003 at 4–11. The United States also incorporates by reference Leveille's factual admissions in the plea agreement, Doc. 917 at 5–10. That said, at its core, sentencing in this case is about Leveille's central role in a conspiracy to kill federal officers or employees. This conspiracy revolved around a handicapped three-year-old boy who Leveille and others kidnapped for use as a prop in a plan to rid the world of purportedly corrupt institutions, including the FBI, CIA, and U.S. military, and to kill those who did not convert and follow the Defendant and her coconspirators. In preparation to carry out this plan, Leveille, a Haitian national who was unlawfully present in the United States, possessed firearms, which

were used extensively by her coconspirators in training themselves and her two eldest sons for the coming "war" and cleansing of society's corrupt institutions. The planning and training for this conspiracy took place at a heavily fortified, purpose-built, militarized compound in Costilla Meadows, New Mexico, about one mile from the Colorado border.

The United States initiated this case by complaint filed on August 31, 2018, charging Leveille and four other co-defendants with a violation of 18 U.S.C. § 371, conspiracy to provide firearms to a person unlawfully in the United States, and 18 U.S.C. § 922(g)(5) and § 2, illegal possession of a firearm by a person unlawfully in the United States and aiding and abetting. Doc. 1. This was followed by an indictment charging the same offenses, filed on September 11, 2018. Doc. 25. The Defendants were arrested on August 31, 2018, and first appeared before a judicial officer of this Court on September 4, 2018. Doc. 13.

On March 13, 2019, the Grand Jury returned a seven-count superseding indictment against all five Defendants, alleging violations of 18 U.S.C. §§ 371 (Conspiracy to Commit an Offense Against the United States), 922(g)(5) (Possession of Firearms by a Person Unlawfully in the United States), 1117 (Conspiracy to Murder an Officer or Employee of the United States), 1201 (Kidnapping), 2339A (Providing Material Support to Terrorists), and 2339A (Conspiracy to Provide Material Support to Terrorists). Doc. 85.

On August 8, 2023, Leveille pleaded guilty to Counts 1 (Conspiracy to Provide Material Support to Terrorists) and Count 5 (Possession of a Firearm While Unlawfully in the United States) of the Superseding Indictment. Doc. 917. Pursuant to the Rule 11(c)(1)(C) plea agreement, the parties agreed that a sentence between 12–17 years was an appropriate disposition of this case with regard to Leveille. *Id.*

Leveille's four co-defendants rejected plea offers made to each of them (*see* Docs. 652, 653, 654, 669) and proceeded to trial. On October 17, 2023, after three weeks of trial, a jury

returned guilty verdicts on most of the charges in the Superseding Indictment. *See* Docs. 1010, 1011, 1014, 1016.

Also on October 17, 2023, the United States Probation Office ("USPO") filed a PSR for Leveille. Doc. 1003. The PSR calculated her offense level to be 43 and a criminal history category of VI, with a guideline imprisonment range of life in prison. *Id.* at 19. However, because the statutory maximum punishments for the two counts to which Leveille pled guilty is 25 years, or 300 months, the PSR ultimately determined her guideline sentence to be 300 months. *Id*. An addendum to the PSR with no substantive changes was filed on February 12, 2024. Doc. 1108.

## **DISCUSSION**

Based on the plea agreement between the parties and in consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a), the United States requests a sentence of 17 years (204 months) incarceration. As set forth below, this sentence takes into account not only the extremely serious nature of the offenses for which Leveille has admitted guilt, but also her taking responsibility for her actions and her state of mind during the offense conduct. Thus, the requested sentence is most likely to achieve the statutory sentencing goals set forth in 18 U.S.C. § 3553.

### A. **The nature and circumstances of the offense, and the seriousness of the offense, warrant the requested sentence.**

The United States emphasizes the seriousness and the extremely dangerous nature and circumstances of Leveille's offenses. As an initial matter, the U.S. Sentencing Guidelines themselves demonstrate the seriousness of the offenses to which Leveille has admitted guilt, particularly the § 2339A offense, as they call for a sentence of life in prison. *See* PSR, Doc. 1003, at 19. Relatedly, the conspiracy to kidnap and kidnapping resulting in the death of Abdul

Ghani, the three-year-old child taken by Leveille and her coconspirators, for which her coconspirators have been convicted after a jury trial, carry mandatory life sentences. Those offenses are relevant conduct and are intertwined with the offenses to which Leveille has pled guilty, further underscoring the gravity of the nature and circumstances of the offenses in this case. *See id.* at ¶¶ 25-26.

It is difficult to overstate the seriousness of the offenses in this case. Essentially, Leveille, along with her coconspirators, built a militarized compound (on land they were quickly informed that they did not own or have any legal right to occupy) in Amalia, New Mexico, for the mutually supportive purposes of (1) training for what they expected to be a war between themselves and those who joined them in following Leveille as the reincarnation of Mary, mother of Jesus, and those who rejected Leveille and her followers, and (2) providing a safe haven within which Leveille and her coconspirators could hide from law enforcement with Abdul Ghani and from which they could engage and kill federal law enforcement officers who came to arrest them.[1] After Abdul Ghani died at the compound, Leveille and her coconspirators

---

[1] In her sentencing memorandum, Leveille admits to planning and preparing to kill FBI agents at the compound based on some abstract-seeming fear of the FBI coming after her. But she never once mentions *why* the FBI, or any other law enforcement personnel, might have had some reason to come to the compound in the first place. To the contrary, echoing similar self-absorbed claims of her coconspirators at trial, Leveille insinuates throughout her sentencing memorandum that the group was merely trying peacefully to live at the compound while being unfairly pursued and "spied on" by the FBI. Doc. 1111 at 19. As a result, Leveille states the group's constant, offensive-geared firearms and tactical training was simply them living in "fear" that the FBI was "planning a destructive raid on their home," *id.* at 11, preparing themselves for "an invasion" of their "homestead" by the FBI, *id.* at 19, and preparing to "protect themselves" for when the FBI "raided their property" (it was, of course, not their property) "and tried to kill them," *id.* at 18.

Entirely missing from Leveille's memorandum is any acknowledgment that she and her coconspirators were consciously hiding at the compound from the FBI and other law enforcement because they knew they had kidnapped Abdul Ghani, that he had died in their custody, and that they would all go to jail if found by law enforcement.

remained at the compound with his body in anticipation of his resurrection and leadership of the group in their planned societal-cleansing war.

In anticipation of the war they were planning to initiate, Leveille and her coconspirators provided material support in the form of weapons, training, personnel, and finances. Leveille authored a book, with assistance from Hujrah and Subhanah Wahhaj, explaining what she and her coconspirators were doing, what they were planning, and why. The book was meant to be a manifesto or a testament that the group would use to announce themselves and convert people to their cause. Doc. 917 at 6. But the book also warned about what would happen to those who did not convert or join the group. *See* Gov. Trial Ex. 11 (Jany Leveille's Book). Contrary to Leveille's framing in her sentencing memorandum, these are not the acts and thoughts of a person simply trying to get away from the horrible, black-magic conjuring, baby stealing Hakima Ramzi and to live peacefully off the land in Amalia.

Leveille was the spiritual and ideological leader of the group, and she was fully aware of the purpose of the militarized compound built by the group in New Mexico as well as the weapons and tactical training going on at the compound. Doc. 917 at 8. She knew that her two oldest sons were being trained to be part of the "Army" that would help carry out the attacks on nonbelievers and members of corrupt institutions, to include federal officers and employees. And she knew that the group's plan was to shoot law enforcement officers if they ever came to the compound, including the day that officers did come to the compound to check on the welfare of the many children living there—August 3, 2018. *Id.* On that occasion, coconspirator Siraj Wahhaj armed himself with multiple firearms and was prepared to engage in a shootout with law enforcement. Fortunately, Leveille ordered Siraj Wahhaj to stand down, and a violent confrontation was narrowly avoided. Doc. 917 at 9.

The intensive effort exerted into making the compound a hardened, militarized safe

haven underscores the seriousness with which Leveille and her group took their collective plans and mission.    Instead of making the compound a comfortable or safe space for the many small children being kept there, the Defendants hand-dug a 100-foot escape tunnel and spider-hole with weapons staged at the end, built numerous fortified firing positions, switchback entries with "kill box" false corridors in surrounding walls, and a full-sized tactical training range, on which the group could train and plan for its coming war.    As the spiritual leader and enforcer who held this conspiracy together, Leveille directed the rest of the group to remain faithful, conceal Abdul Ghani's death and whereabouts, and look forward to the group's societal reckoning.    *See, e.g.*, Gov. Trial Exs. 11, 93, 94.    After Abdul Ghani died, Leveille convinced the rest of the group that he was going to resurrect on Easter, which was April 1, 2018, and that he would lead the group to face society and kill those who did not join them.    In response, the group's firearms and tactical training ramped up in frequency, intensity, and complexity in anticipation of the Easter resurrection.    *See* Gov. Tr. Exs. 81, 82.    Finally, after Abdul Ghani did not resurrect on Easter, Leveille began to talk about him returning around the time of his birthday (August 4, 2018) or, chillingly, as Subhanah Wahhaj's soon-to-be born child.    *See* Gov. Trial Ex. 85 at 21; Tr. at 536–37.

      Other aspects of the nature and circumstances of the Leveille's offenses are worth noting as well.    First, Leveille's material support in this case was extensive, and included writing a recruitment letter to Siraj Wahhaj's brother, Muhammad, imploring him to take all of his money out of the bank and bring his guns (just as the rest of the defendants had already done) to join the group in New Mexico, where he would have the opportunity to die as a martyr.    *See* Doc. 917 at 9; Gov. Trial Ex. 23.    The harsh living conditions at the compound also speak volumes about the seriousness of her offenses.    This includes the dangerous and unsanitary conditions to which the group subjected their 12 children (11 after Abdul Ghani's death) for nine months,

approximately four of which most of the children spent entirely underground in the tarp-covered trailer that they referred to as "the hole." *See, e.g.*, Trial Transcript ("Tr.") at 407–08.

Thankfully, Leveille and the rest of the group were taken away from the compound by well-prepared law enforcement and arrested before their plans could be realized.

**B. Defendant's history and characteristics warrant the requested sentence.**

Leveille was a leader of a group of coconspirators that she directed based on her claimed prophetic status and messages she claimed to receive from God. However, before making her religious claims and recruiting followers, Leveille was a Haitian national illegally in the United States who had repeatedly been denied adjusted or permanent visa status. Her "husband" Siraj Wahhaj was, in fact, legally married to Hakima Ramzi (the victim-mother of the kidnapped Abdul Ghani), who was herself a legal permanent resident in the United States by way of her marriage to Siraj. Moreover, video evidence found on electronic devices at the compound show that Siraj Wahhaj had also visited Haiti in the months just before the offense conduct in this case and was looking at purchasing property and moving there—something that Leveille had expressed to others that she did not want to do.

Hence, in the fall of 2017, in order for Leveille to get what she wanted and needed to legally be in the United States, she needed to replace Hakima Ramzi as the lawful spouse of Siraj Wahhaj. Uncoincidentally, this is about the time that Leveille began to receive messages from God that Hakima Ramzi was practicing black magic and had stolen Abdul Ghani from Leveille's womb. It was also around this time that Leveille recruited a following by claiming to read passages from the Quran and then tell people things about themselves to make them believe in her as a divine messenger. *See, e.g.*, Tr. at 709–10; 1013–14. This group helped Leveille kidnap Abdul Ghani from Hakima Ramzi and separate Hakima from Siraj. In so doing, Leveille removed the last remaining link between Siraj Wahhaj and Hakima Ramzi—their child

7

Abdul Ghani.

Within a few months, Leveille and her coconspirators had taken Abdul Ghani from Hakima Ramzi and completely disappeared from the rest of the Wahhaj family and all other family and friends who might try to stop the group's plans and preparations. During the group's flight from Georgia with Abdul Ghani, Hakima and Siraj exchanged text messages "divorcing" each other. As part of Hakima's desperate efforts to get her son back, she filed for emergency custody and divorce in Georgia state court, receipt of which Siraj and the rest of the group consciously and successfully avoided until their arrests in August 2018. *See* Gov. Trial Exs. 8, 9, 9a.

Thus, there is substantial, persuasive evidence that Leveille's prophesies and revelations were motivated by a personal desire to extricate Hakima Ramzi from the family dynamic and advance her own interests in obtaining legal status in the United States. In order to do this, she had to keep her divine messenger story and the group's beliefs alive and powerful enough to maintain their willingness to continue running and hiding from law enforcement and preparing for a war on corrupt institutions. In other words, as even her own young daughter recognized, Leveille had to keep "playing" the roles she had created for everyone in the group because they had gone too far and were "all going to jail." *See* Gov. Trial Ex. 11 at 29.[2]

---

[2] Leveille makes no mention in her sentencing memorandum of neither her unlawful immigration status throughout the time of the offense conduct nor her own concerted efforts to manipulate others to believe her claims of receiving messages from God. Rather, she calls others' beliefs in her "inexplicable," as though she played no role in it. Doc. 1111 at 17. What's more, rather than truly take full responsibility for her actions, Leveille repeatedly blames Hakima Ramzi—the legal wife of Siraj Wahhaj who barely spoke English, had no family, money, transportation, or support network in the U.S. beyond what little the Wahhaj family and Leveille provided, and who Leveille knew was the legal wife of Siraj before Leveille nevertheless entered into a relationship and had several children with Siraj—as being the actual cause of Leveille's actions involving the abduction of Abdul Ghani and providing material support to terrorists. *See, e.g.*, Doc. 1111 at 8–11 (asserting that the "well-known Moroccan practices" of "Black Magic" by Hakima Ramzi was the impetus for the Defendant to "fear" and have "paranoia" of Hakima, and

In addition to the obvious inferences to be made (and which the jury did make in the trial of Leveille's coconspirators) from the group's hurried escapes in the middle of the night from Georgia to Alabama to New Mexico and from their hiding in "the hole" for months to avoid the FBI, Leveille herself expressed on multiple occasions her own clear understanding that she and her coconspirators were running and hiding from the law and that they just needed to keep faith a little while longer until Abdul Ghani woke up and they could begin the war for which they had been training.  *See, e.g.*, Gov. Trial Ex. 93 (Leveille's messages to her brother Von in February 2018 stating that she knew Muhammad Wahhaj had turned her recruitment letter to him (Gov. Trial. Ex. 23) over to the cops "cause he thinks im fake" and that Abdul Ghani was going to "kill the kaffir [infidels]" as part of the group's plan); Trial Ex. 94 (Leveille's messages to her brother in July 2018 that the group discussed "all the miracles" at the compound, including Abdul Ghani's perceived slow rate of decomposition, which is "what keep them [the other conspirators] strong here"); Ex. 85 at 21 (Leveille's messages on August 4, 2018, to her brother stating that the group was "waiting" for Abdul Ghani's resurrection, and "IA [inshallah or God willing] Ghani comes on Monday n it's all over").

In sum, there is compelling evidence that Leveille was knowingly attempting to manipulate the people in her life to achieve her goals of separating her Islamic husband from his lawful spouse, gaining lawful status in the United States, and avoiding arrest or consequences for the kidnapping of Abdul Ghani.   This is in addition to Leveille's admitted participation in very

---

claiming the stress from Hakima's presence and being "trapped in a shared home with her co-wife" must have caused her to become mentally ill and commit the offense conduct).   This line of blame-shifting to the victim in this case in attempting to mitigate or explain Leveille's offenses should carry no weight with the Court, as "stress" of being a "co-spouse" as an underlying reason for kidnapping the other spouse's child and training to kill federal agents when that child resurrected from the dead is, if anything, and aggravating motivation for Leveille's conduct.

real plans and preparations to murder federal officers and employees, including by possessing firearms while she knew she was unlawfully present in the United States.   Altogether, the requested sentence of 17 years' imprisonment takes into account Leveille's history and other personal characteristics.   The United States believes this sentence is sufficient, but not greater than necessary, to achieve the goals of 18 U.S.C. § 3553.

### C. The requested sentence promotes respect for the law.

Leveille was a leader of a group that elevated its own religious beliefs and practices over the secular law of the United States.   The group did so expressly.   They practiced these beliefs and followed their own rules at their compound in New Mexico.   They separated Abdul Ghani from his mother, deprived him of his necessary anti-seizure medication and subjected him to hours of painful and distressing exorcism rituals on a daily basis, all resulting in his death, less than a month after his abduction, on a cold, barren patch of dirt in New Mexico, thousands of miles from the only caregiver he had ever known.   Leveille and her group's beliefs and practices were used to justify not only their plans and preparations to kill officers and employees of the United States, to include FBI, CIA, and military members, but also to start a war against the non-believers and (in their minds) literally replace the national and international governmental and societal status quo with their own version of society, adhering to their unique religious beliefs and practices with Leveille as the spiritual leader.   All of this was to be at gunpoint, for which Leveille had her oldest sons trained to carry out, and while Leveille was knowingly in the United States without legal status.   Thus, Leveille's lack of respect for the law of the United States was close to non-existent.

Even at trial, Leveille's coconspirators continued to flaunt their utter lack of regard for the law.   In their own telling, the group went along with her claim that the three-year-old Abdul Ghani was actually her child stolen from her womb.   Doc. 1003 at 5.   As such, Leveille and

her coconspirators indignantly claimed it was acceptable to disregard any and all state and federal laws in taking Abdul Ghani away from his custodial, caregiving mother, absconding across multiple state lines, and hiding out in a tarp-covered hole in the remote New Mexico sagebrush well after Abdul Ghani's death at their hands.   In pursuit of Leveille and her coconspirators' plans and preparations to kill federal officers and employees, Leveille and her followers attempted to recruit others to their cause (Doc. 1003 at 8), withheld medication from Abdul Ghani and took no action to save his life as he died in front of their eyes (*id.*), and did not report to anyone—family, friends, or law enforcement—Abdul Ghani's death or the location of his body, even after law enforcement entered their compound looking for him (*id.* at 10).

A sentence of 17 years' imprisonment will send a very real, important, and needed message that the United States is a country of laws, and the rule of law must be respected by all who live here.   The requested sentence will indeed promote a respect for the law to Leveille specifically, as well as those who become aware of the sentence.

### D.  The requested sentence serves to deter further criminal conduct.

As discussed above, Leveille did not feel deterred by the law in the nine-month string of criminal conduct leading to this case.   However, the United States' recommended sentence is a significant sentence that will serve to provide a strong deterrent message.   This is the case even after taking into account Leveille's acceptance of responsibility for the two offenses of conviction.   To that end, 17 years' imprisonment is appropriate as sufficient, but not greater than necessary, to accomplish this sentencing goal.

### E.  The requested sentence will avoid unwarranted disparities.

Although the imprisonment range under the applicable guideline for Leveille's offenses is life, and the statutory maximum available sentence is 300 months' (25 years') imprisonment (Doc. 1003 at 19), the United States believes a reasonable sentence in this case takes into

consideration the facts that she accepted responsibility for the offenses of conviction and allowed the United States to conserve resources that would have been required by a trial. While it is undeniable that any sentence within the range agreed upon between the parties in the plea agreement will be significantly lower than the statutory maximum, the Guidelines range, the average sentence for others convicted of the same offenses across the nation, and the sentences that Leveille's coconspirators will likely receive, the requested sentence will actually avoid unwarranted disparities.

Specifically, this is because Leveille's guideline sentence increases far beyond the statutory maximum, as her offenses of conviction fall under the U.S.S.G. § 2A1.5 due to a cross reference to the murder guideline. Doc. 1003 at 12. However, the statutory maximum for the two offenses of conviction is 300 months (and only if sentences for both counts were to be served consecutively). *Id.* at 19. If served concurrently, the maximum would be based on the § 2339A sentence, which is 15 years, or 180 months. *See* 18 U.S.C. § 2339A. The United States' requested sentence of 204 months (17 years) is a significant sentence, is reasonably reduced from the statutory maximum of the two offenses of conviction (if stacked consecutively), and does not constitute an unwarranted disparity in length from a sentence based on a statutory perspective. Thus, although constituting a downward variance from the amended PSR's correctly calculated range, a sentence of 17 years (204 months) is within the range of the offense as contemplated by statute, takes into account other mitigating factors and Leveille's acceptance of responsibility, and avoids unwarranted sentencing disparities.

F. **The requested sentence provides just punishment and protects the public from further crimes of the Defendant**

As discussed above, there are several aggravating factors to Leveille's offenses here, but there are also mitigating factors related to her acceptance of responsibility and lack of prior

criminal history.   The United States anticipates victim impact statements to similarly emphasize both the mitigating and aggravating factors discussed throughout this memorandum, including that Leveille has been the only one of the coconspirators in this case to apologize to many of those who were harmed by the group's actions.   The balancing of these factors leads the United States to recommend that just punishment includes a sentence of 17 years' imprisonment, which is likely to be followed by removal of Leveille from the United States.   Further, at the conclusion of 17 years' imprisonment (over five of which Leveille has served), Leveille will be over 50 years old.   She will then enter removal proceedings which, if effectuated, will ensure the American public's protection from her.   Thus, this sentence will protect the public from further crimes of Leveille and will serve as just punishment for the offenses to which she has admitted guilt.

## CONCLUSION

The United States requests that the Court sentence Leveille to a period of imprisonment of 17 years, followed by a term of supervised release.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*/s/ Electronically Filed*
KIMBERLY A. BRAWLEY and
TAVO HALL
Assistant United States Attorneys
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 346-7274

*/s/ Electronically Filed*
GEORGE C. KRAEHE and
JESSICA JOYCE
Trial Attorneys
Counterterrorism Section
National Security Division

U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, D.C. 20530

I HEREBY CERTIFY that I filed the Foregoing pleading electronically through the CM/ECF system, which caused counsel of record for defendant to be served by electronic means.

***Filed Electronically***
TAVO HALL
Assistant U.S. Attorney